**FEDERAL DEPOSIT INSURANCE CORPORATION, in its corporate capacity, Plaintiff–Appellee,**

v.

**Ernest P. JENKINS, et al., Lynne Hardin, Defendants–Appellants.**

No. 88–3798.

United States Court of Appeals, Eleventh Circuit.

Nov. 27, 1989.

Jonathan Cohen, Shutts & Bowen, Don A. Lynn, Miami, Fla., Jenkins, Walters & Kaiser, P.A., St. Petersburg, Fla., for defendants-appellants.

Robert Pass, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, Fla., for plaintiff-appellee.

Eric Summergrad, SEC, Joseph O. Click, Paul Gonson, Daniel L. Goelzer and Jacob H. Stillman, Washington, D.C., amicus curiae.

Before FAY and HATCHETT, Circuit Judges, and HOFFMAN *, Senior District Judge.

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

**1538**

WALTER E. HOFFMAN, Senior District Judge:

This appeal concerns whether the Federal Deposit Insurance Corporation (FDIC) is entitled to an absolute priority to assets of officers, directors and other third parties who may have been responsible, at least in part, for the failure of Park Bank of Florida (Park Bank) and a purchase and assumption transaction by the FDIC. For the reasons stated below, we find that the FDIC is not entitled to such a priority and accordingly reverse the judgment of the district court.[1]

I.

Park Bank, a wholly-owned subsidiary of Florida Park Bank, Inc. (FPBI), was a state-chartered bank regulated by the FDIC and the Florida Department of Banking and Finance (the Department). The FDIC insured Park Bank's deposits.

On February 14, 1986, the Department declared Park Bank insolvent and appointed the FDIC as receiver of the bank. The Circuit Court for Pinellas County, Florida, confirmed the appointment and approved the sale of certain bank assets by the FDIC, in its capacity as receiver, to the FDIC in its corporate capacity. The court also approved a purchase and assumption agreement between the FDIC as receiver and Chase Bank of Florida, N.A.[2]

Following the insolvency, several FPBI shareholders filed state lawsuits against several officers and directors of Park Bank, an accounting firm which had performed audits for the bank, and two law firms which had provided legal services to the bank (collectively the "bank-related defendants"). These suits alleged securities fraud claims under the Florida Securities and Investor Protection Act, common law fraud, civil conspiracy, negligence and a claim under Florida's "civil theft" statute. Several shareholders also brought a parallel federal court suit which alleged claims under section 10(b) of the Securities Exchange Act of 1934 and the federal Racketeer Influenced and Corrupt Organizations Act (RICO).

The FDIC, which became sole owner of all claims, actions and judgments of Park Bank after the purchase and assumption agreement, brought belated claims against several defendants alleged to have harmed the Park Bank. These defendants are substantially similar to the bank-related defendants sued by the shareholders. The FDIC seeks $30 million in damages to Park Bank which allegedly resulted from the negligence and breach of fiduciary duty by the bank-related defendants. The FDIC has also brought suit against Park Bank's accounting firm for negligence and breach of fiduciary duties, seeking damages for loan losses resulting from an allegedly fraudulent audit.

The FDIC brought a separate action in the United States District Court, Middle District of Florida, against the shareholders seeking a declaratory judgment that all of the shareholder's claims, except those based on state and federal securities law, were derivative actions, and thus were the property of the FDIC as the assignee of Park Bank. The FDIC also sought a decla-

1. In fairness to the district court, our conclusion is strongly supported by the legislative history of the recently-enacted Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101-73, 103 Stat. 183, signed by the President on August 9, 1989. This history clearly refutes FDIC's argument that it was the intent of Congress to grant the priority as contended by the FDIC in this case. An amendment granting such priority was specifically rejected by the conference committee. See: 135 Cong.Rec. H4985, H4989 (daily ed. Aug. 3, 1989). The Senate amendment, Section 214(*o*), applied to both banks and savings associations, and would have added to the FDIC Act and "would have given the FDIC priority in claims against directors, officers, attorneys, and other third party agents of a failed savings institution over shareholders, depositors, and creditors." *Id.* at H4985 (Statement of Rep. Glickman). The legislation was enacted after the Senate conferees agreed to recede and the enacted legislation makes no provision for such priority. *Id.* at H4989. The FDIC argues that the rejection of Section 214(*o*) is not binding upon the Court. That may be true, but it is certainly highly persuasive.

2. The mechanics of a purchase and assumption transaction are more fully explained *infra* 1539–1540.

ration that as a general creditor of Park Bank and assignee of any causes of action owned by Park Bank, the FDIC's claims against the officers, directors and other defendants should have priority over the shareholder's claims against the parties. The FDIC sought to enjoin the shareholders from recovering from these defendants' assets until the FDIC had satisfied its claims. Both the FDIC and the shareholders moved for summary judgment.[3]

The district court granted the FDIC's motion for summary judgment in part and denied the shareholders' motion. *FDIC v. Jenkins,* Case No. 86–566–Civ–T–10, Order at 12–13 (M.D.Fla. May 24, 1988) (hereinafter "Order"). The court found that despite the claims of the parties to the contrary, none of the cases cited by the parties in their summary judgment briefs held that the FDIC has, or does not have, an absolute priority over claims of allegedly defrauded shareholders after liquidation of a state-chartered bank. *Id.* at 8. The court found, however, that several policy considerations supported the FDIC's position. *Id.* at 9. Because of the risks which a shareholder knowingly takes when making an investment, the court found that it would be inequitable to require general creditors to share equally in recovery with shareholders. *Id.* The FDIC, which the court found to be a general creditor, would be forced to use its insurance fund to finance the risk assumed initially by the shareholders. *Id.*

The court further stated that forcing the FDIC to share the risks of loss with the shareholders would make the FDIC's decision concerning the course to be taken upon bank failure exceedingly difficult as the FDIC would be unable to accurately determine the amount of assets available to satisfy the bank's debt. *Id.* at 9–10.

The court enjoined the shareholders from attempting to collect the proceeds of any settlement with, or garnish or levy on any judgments against the bank-related defendants, and enjoined the bank-related defendants from paying any funds or delivering any consideration to the shareholders in settlement or discharge of the asserted claims. *FDIC v. Jenkins,* Case No. 86–566–Civ–T–10, Final Judgment at 3–4 (M.D. Fla. August 30, 1988). The court also ordered that any judgment obtained by the shareholders should state on its face that it is subordinate to judgments obtained by the FDIC against the bank-related defendants. *Id.* at 4.

This appeal followed.

## II.

The issue before this Court is whether the FDIC is entitled to priority, either through its status as insurer of the failed Park Bank or through general principles of priority following insolvency, over the Park Bank shareholders for claims against solvent third parties. Both of these potential sources of priority will be addressed below.

### A. *Priority of FDIC as Insurer of Bank Deposits*

The FDIC was created by Congress during the Depression in an effort to safeguard bank depositors from the dangers of bank failures. *FDIC v. Philadelphia Gear Corp.,* 476 U.S. 426, 432–35, 106 S.Ct. 1931, 1935–37, 90 L.Ed.2d 428 (1986) (quoting 77 Cong.Rec. 3837, 3840 (1933)). The cornerstone of Congress's bank protection system was the deposit insurance program which insured depositors against potential loss from a bank failure up to a stated monetary amount. *See* 12 U.S.C. section 1821(a).

When a bank fails, the FDIC will generally be appointed as a receiver. 12 U.S.C. section 1821(c), (e) (1982). The FDIC will then proceed to determine the future course for the failed bank. The FDIC has two alternatives: (1) a "deposit payoff" or liquidation where the bank is closed and the FDIC pays the depositors up to the $100,000 per account limit out of the deposit insurance fund, *see* 12 U.S.C. section

---

3. The FDIC also filed a motion to intervene in the shareholders' state court suits on the same ground as the declaratory judgment so as to have the state court stay the state proceedings. The state court, after a hearing on July 16, 1986, denied the FDIC's motion without prejudice.

1821(d) (1982); or (2) a "purchase and assumption" transaction where the FDIC arranges for the sale of the failed bank's assets and deposit liabilities to another solvent bank. *See* 12 U.S.C. section 1823(c)(2), (c)(4)(A) (1982). The failed bank reopens in the solvent bank's name, and depositors are benefited by uninterrupted banking service. *See Gunter v. Hutcheson,* 674 F.2d 862, 865 (11th Cir.1982).

Before engaging in a purchase and assumption transaction, the FDIC must determine that the deposit insurance fund would suffer a greater loss in liquidation than in the purchase and assumption transaction. *See* 12 U.S.C. section 1823(c)(4)(A) (1982). This is done by performing a "cost test" where the benefit of a purchase and assumption transaction is measured by the value of the bids which are made by solvent banks for the failed bank's assets and deposit liabilities.[4]

A purchase and assumption transaction is considered more desirable than a liquidation for several reasons, including that a bank closing deteriorates public confidence in the banking system, that closing a bank disrupts the operation of other solvent banks, that a liquidation may force depositors to wait for months to recover the insured portion of their funds, and that uninsured portions may never be recovered. *Gunter,* 674 F.2d at 865.

If the purchase and assumption transaction is the course chosen by the FDIC, then FDIC will sell the assets and deposit liabilities of the failed bank to the assuming bank. The assuming bank has the option to return to the FDIC in its receiver capacity those assets which the assuming bank finds to be of limited value. *Id.* The FDIC in its "corporate" capacity then purchases the returned assets from the receiver FDIC, which transfers the purchase price of the returned assets to the assuming bank. *Id.* The corporate FDIC attempts to collect on the returned assets, and proceeds from these collections are applied to replenish the insurance fund. As this Court stated in *Gunter,* through a purchase and assumption transaction, the FDIC "minimizes its loss, the purchasing bank receives a new investment and expansion opportunity at low risk, and the depositors of the failed bank are protected from the vagaries of the closing and liquidation procedure." *Id.* at 865–66.

The FDIC takes the position that a necessary element of a purchase and assumption transaction is an absolute priority for the FDIC in suits against third parties. Such a priority, the FDIC argues, would best aid the FDIC in replenishing the permanent insurance fund.[5] The FDIC reasons that

---

4. The FDIC argues that the prospects of collecting judgments against bank-related defendants is an important factor in performing the "cost test." The record does not support this contention. In an exhibit made a part of the summary judgment proceedings, the deposition testimony of A.J. Felton, the FDIC bank liquidation specialist in charge, given for the United States Bankruptcy Court at Tampa, Florida, on November 5, 1987, in the matter of Florida Park Banks, Inc., debtor, reveals that he was examined with respect to the "cost test" performed on the Park Bank. At page 14203, inquiry was made of Felton as to the value of claims against third parties to which Felton replied that they have not been identified as assets and that it would be impossible to evaluate such claims. See: exhibit attached to defendant's reply memorandum in opposition to FDIC's motion for summary judgment appearing in ROA 4 of 4, page 14203–04. This refutes the argument of FDIC that it was necessary to evaluate these claims before determining whether a purchase and assumption could be undertaken.

5. The legislative history referred to in footnote 1 presents the argument that the establishment of an absolute priority would be a disincentive to private fraud suits and harm the enforcement scheme (as argued by the amici, the Securities and Exchange Commission) because it would lead to more fraud and ultimately cost the taxpayers more money. In 1987, the FDIC recovered about $59 million in bank-related defendant lawsuits, and it cost the FDIC approximately $54 million to litigate these cases. Additionally, Government agencies generally move at a snail's pace and many potential recoveries could be lost because of the statute of limitations. The granting of such a priority would not only affect the public's investment in bank stocks but would also essentially destroy any litigation by privately affected shareholders or creditors. No attorney or expert accountant will become engaged in complex litigation against officers, directors or other shareholders who may have defrauded the bank, if they are cognizant of the fact that any potentially successful litigation could be disrupted by the belated action of the

as minimizing the depletion of the insurance fund is an express goal of the FDIC's statutory framework, the FDIC could not carry out its alleged statutory mission unless it had the ability to assert priority over the shareholders who are seeking recovery from the same assets as the corporation and that the need for the priority rule is thus "implicit" in the statutory scheme of the FDIC.

We agree that preservation of the permanent insurance fund is vital to the continued health of the nation's banking system. The FDIC should take all feasible measures authorized in the Federal Deposit Insurance Act to maximize recovery to the fund. We cannot, however, approve of judicial expansion of the express powers and rights granted to the FDIC in the Act by Congress. As the Federal Deposit Insurance Act contains no indication of an intention to create an absolute priority rule in favor of the FDIC, we must reverse the district court's finding based on policy considerations in favor of such a rule for the FDIC.[6]

The case law advanced by the FDIC does not support a contrary finding.[7] In *FDIC v. American Bank Trust Shares, Inc.*, 412 F.Supp. 302 (D.S.C.1976), *vacated and remanded*, 558 F.2d 711 (4th Cir.1977), *on remand*, 460 F.Supp. 549 (D.S.C.1978), *aff'd*, 629 F.2d 951 (4th Cir.1980), the FDIC was appointed receiver of American Bank & Trust (AB & T) by a South Carolina state court. *Id.* at 305. The FDIC, in its corporate capacity, purchased from FDIC as receiver several assets of AB & T, including all claims and causes of action of the receivership.

The FDIC brought a declaratory action, seeking a ruling that it owned all causes of action for harm or wrong done to AB & T. Shareholders of AB & T represented by Carl Joe Taylor brought a derivative suit against several directors of AB & T, and the district court ordered that these shareholders become a part of the federal court case and that all connected state court proceedings be stayed.

Another group of shareholders, led by Sidney Robinson Bagby, also brought a derivative suit against the directors of AB & T and/or American Bank Trust Shares (ABTS) in a federal court. These plaintiffs were also brought into the existing federal court suit with the FDIC. Sadie G. Schein, a holder of a subordinated capital note, brought suit on behalf of all subordinated capital noteholders of AB & T in state court, alleging fraud and deceit. Schein was also made a party in the federal action, *FDIC v. American Bank Trust Shares, Inc.*

The district court held that the FDIC owned all causes of action for harm done to ABTS, including claims against directors, officers and employees of the bank. *Id.* at 305–06. The court also ordered a stay on

FDIC claiming a priority as to any assets held by the parties who participated in the fraudulent operation of the bank, and attempting to profit by whatever was discovered in the private litigation.

6. While we do not necessarily disagree with the policy considerations advanced by the district court, we note that as the Federal Deposit Insurance Act indicates no such priority, a decision to give the FDIC such a priority is more properly within the domain of Congress. We decline the FDIC's invitation to act on arguments based in equity or on "implicit" powers. *See Langley v. FDIC*, 484 U.S. 86, 94, 108 S.Ct. 396, 402, 98 L.Ed.2d 340 (1987).

7. The district court also made this observation, stating "[i]n spite of the claims of the parties to the contrary, none of the cases cited by the Plaintiff or Defendants hold that the FDIC has or does not have absolute priority over the

claims of allegedly defrauded shareholders in the context of liquidation of a state chartered bank." *FDIC v. Jenkins*, Case No. 86–566–Civ–T–10, Order at 8 (M.D.Fla. May 24, 1988). The appellate briefs of the parties reflect a similar treatment of the prior case law.

One district court case, *Crocker v. McMullan*, 623 F.Supp. 963 (D.Miss.1985), rev'd sub. nom, *Crocker v. FDIC*, 826 F.2d 347 (5th Cir.1987), denied an FDIC motion to stay proceedings of a RICO claim by shareholders of a defunct bank based on an absolute priority rule. The court found that because the plaintiff's action was not derivative and because the plaintiffs sought damages against the majority shareholders, not the failed bank, the FDIC was not entitled to a priority. *Id.* at 968. The Fifth Circuit reversed the district court's decision, finding that the stockholders lacked standing to bring nonderivative RICO claims. *Crocker*, 826 F.2d at 352. The *Crocker* decision is entitled to no binding weight in this Court.

the non-derivative suits by Schein for fraud and deceit. The court found that "[t]he subordinated capital notes, by their terms, were subordinate to the obligations of AB & T to its general creditor." *Id.* at 307. As the FDIC stood in the shoes of the general creditor, the FDIC therefore had a priority over the subordinate capital noteholders.

The district court stopped short, however, of creating an absolute priority for the FDIC, stating that:

> The court is presently also of the view that FDIC is entitled to a priority over subordinated capital noteholders with respect to any recovery from directors and officers, and any policy insuring said persons. As a general rule, equity prefers the claims of innocent general creditors over the claims of shareholders or subordinated creditors deceived by officers of the corporation. However, before making a final determination on this point, the court at a proper time will give all parties an opportunity to be heard on the issue of priority of the disbursement of funds recovered by any party.

*Id.* at 307–08 (citations omitted).

On appeal, the Fourth Circuit vacated the district court's decision with directions for the district court to consider several issues raised by the defendants in a counterclaim concerning the method by which the FDIC acquired title to the bank's assets. *FDIC v. ABTS,* 558 F.2d 711, 713 (4th Cir.1977). The appellate court stated, however, that they did not "disagree with the district court's conclusion that FDIC has demonstrated apparent title to the choses in ac-

tion." *Id.* On remand, the district court decided the issues presented in the counterclaim, but did not make any further findings concerning its prior inclination of granting the FDIC a priority over recovery from directors and officers.[8] The decision in the series of *ABTS* cases therefore does not firmly establish that the FDIC is entitled to have this Court recognize a priority.

Nor does *Palmer v. Metropolitan Bancorporation,* Case No. 82–141–Civ–T–WC (M.D.Fla. May 23, 1983), *appeal dismissed,* 751 F.2d 392 (11th Cir.1984), offer much assistance to the FDIC. Although the district court in *Palmer* stated that "the absolute priority rule requir[es] that the claims of general creditors be satisfied before an insolvent corporation's shareholders receive any distribution," *Palmer,* Order at 3 (citing *In re Stirling Homex Corp.,* 579 F.2d 206, 211 (2d Cir.1978), *cert. denied,* 439 U.S. 1074, 99 S.Ct. 847, 59 L.Ed.2d 40 (1979)), this Court, upon review of the record, found that "no ruling whatsoever has in fact been made concerning the priority of any claims asserted." *Palmer v. Metropolitan Bancorporation,* No. 83–3471, Order at 2 (11th Cir. Dec. 12, 1984) (unpublished). This Court concluded that the appeal was premature and dismissed the appeal.[9] *Id.* at 3. The *Palmer* decision is thus of no persuasive value on the issue of priorities.

One other district court case, *Harris v. Stanley,* Civil No. F 86–43 (N.D.Ind. Jan. 27, 1989), also addressed the priority issue. *Harris* involved allegations of federal and state securities fraud against several directors of Allen County Bank and two

---

**8.** The court found that the FDIC did not procure its appointment by fraud, *ABTS,* 460 F.Supp. at 555; that the shareholders were estopped from contesting the constitutionality of state statutes concerning bank charters and operations, *id.* at 557; that the shareholders could not collaterally attack the state Board of Bank Controller's appointment of the FDIC as receiver, *id.* at 558; that the bank statutes were constitutional and did not deny minimal due process, *id.* at 559–60; and that the shareholders' claims are subordinated to the claims of the general creditors, which includes the claims of the FDIC. *Id.* at 561. The court also reaffirmed its prior decision that the Schein defendants, though owners of causes of action for alleged fraud and deceit

against the officers and directors of AB & T, were precluded from proceeding to trial until further court order. *Id.*

**9.** A Notice of Settlement and Stipulation of Dismissal with Prejudice was filed in the *Palmer* litigation on April 1, 1986, with prejudice against Metropolitan Bancorporation, then doing business as Allied Banks, Inc., and several other defendants. *See Palmer v. Metropolitan Bancorporation,* Case No. 82–141–Civ–T–WC, Notice of Settlement and Stipulation of Dismissal with Prejudice at 1–2 (M.D.Fla. April 1, 1986). No indication of any decision concerning the priorities appears from the record.

counts of racketeering against one bank director. *Id.*, Order at 2. The plaintiff sought rescission of his stock purchase. *Id.*

One month after the plaintiff filed suit, Allen County Bank was declared insolvent and the FDIC was appointed as receiver. The FDIC conducted a purchase and assumption transaction with Indiana National Bank, which purchased several assets and deposit liabilities from the FDIC. The corporate FDIC agreed to purchase certain delinquent and classified loans not desired by Indiana National Bank.

The FDIC filed a motion to intervene and stay the proceedings in the plaintiff's case. *Id.* at 4. The district court granted the motion to intervene, and the FDIC filed a complaint against several defendants, alleging that the loss caused to the Allen Bank was caused by acts or omissions of the defendants. *Id.* at 4–5.

The FDIC again sought to stay the plaintiff's suit, alleging that the plaintiffs were improperly attempting to elevate their claims to the status of a priority creditor and that allowing the actions to proceed would contravene the statutory rules for banking. *Id.* at 6. The FDIC relied on *Palmer* and *ABTS* in support of its priority argument. *Id.* at 7–8.

The court, quoting *Palmer* and *ABTS*, found that the FDIC was entitled to an absolute priority over the shareholder's claims. *Id.* at 8–9. The court stated that "it makes sense to the court to allow the FDIC case to proceed first. In that way, the assets can be liquidated by the FDIC and a value can be placed upon plaintiff's stock. Without such a determination first, there would appear to be no way to place a definite value on John Harris' stock." *Id.* at 11. The opinion's reliance on authority

which did not create a priority in favor of the FDIC diminishes the persuasive value of the district court's decision in *Harris*, and we decline to follow the decision as precedent.

The FDIC would have this Court take an expansive view of the powers necessary for the FDIC to conduct a purchase and assumption transaction. Specifically, the FDIC wants this Court to allow the FDIC to exercise "all powers incidental" to carrying out its express obligation to the fund, which would include granting an absolute priority over other claims. The FDIC has not directed this Court to any authority which would support this broad interpretation, and we have not independently discovered any rationale which would support the FDIC's position.

The FDIC also argues that an absolute priority is necessary for the FDIC to rely on the cost test in a purchase and assumption transaction. *See*, footnote 4. We are unconvinced by the argument of the FDIC. This Court's opinion in *Gunter*, 674 F.2d 862 (11th Cir.1982), is instructive in this regard. In *Gunter*, this Court concluded that section 2[13](e) of the Federal Deposit Insurance Act [10] did not protect the FDIC against a notemaker's defense of fraud, *id.* at 867, but went on to fashion a federal common law rule which protected the FDIC on notes acquired in a purchase and assumption transaction in good faith for value and without notice of claims or defenses of the notemaker. *Id.* at 872. The Court concluded by limiting the scope of the *Gunter* decision, stating:

> [B]ecause this rule is based largely upon the need for quick decisions by the FDIC regarding the method to best handle a bank failure, the rule applies only when the FDIC acquires a note in the execution of a purchase and assumption trans-

---

**10.** Section 2[13](e) of the Federal Deposit Insurance Act provides:

No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

12 U.S.C. section 1823(e) (1982).

action. In other, more normal, commercial contexts, we see no reason to relieve the FDIC from the ordinary operation of state law. Second, because another primary basis of the rule is the need for the FDIC to rely on the books and records of the failed bank in assessing its potential liability under a purchase and assumption vis-a-vis a liquidation, the protection from unknown fraud is available only to the extent the FDIC pays value for the note and thereby jeopardizes a portion of the insurance fund.

*Gunter,* 674 F.2d at 873. *See also Langley v. FDIC,* 484 U.S. 86, 91, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987) ("The [purchase and assumption transaction], in particular, must be made 'with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services.'"). The value of a potential lawsuit against solvent third parties cannot be assessed during the quick review of a failed bank's books which occurs during a purchase and assumption transaction. Without any doubt, the collections against solvent third parties would help the FDIC in restoring any loss to the permanent insurance fund, but such recovery can only be viewed at best as a contingency at the time of the purchase and assumption transactions. Denying the FDIC an absolute priority does not appear to make a cost test prior to a purchase and assumption transaction any less accurate.

The FDIC makes much criticism of the *Gunter* decision and states that the Supreme Court in *Langley* expressly disapproved *Gunter*'s conclusion and that the FDIC's statutory framework contained "implicit" purposes not literally articulated but which were required to "adequately fulfill" the statute's purpose. We disagree with the FDIC's manipulation of the *Langley* decision. While it is true that *Langley*

defined "agreement" within section 1823(3) broader than the Eleventh Circuit had in *Gunter,* nothing in the *Langley* decision would suggest that this Court should take a broader view of the powers of the FDIC under the Federal Deposit Insurance Act.

The Court in *Langley* stated that the common meaning of "agreement" must be "assigned to its usage in section 1823(e) if that section is to fulfill its intended purposes." *Langley,* 484 U.S. at 91, 108 S.Ct. at 401. The Court also found that two purposes, ready and reliable information to aid evaluations in the event of a sale of the bank's assets and mature consideration of unusual loan transactions, were implicit in the section's requirements. *Id.* at 91–92, 108 S.Ct. at 401–402. The Court was careful to note, however, that in interpreting the meaning of section 1823(e), it would not "engraft an equitable exception upon the plain terms of the statute." *Id.* at 94, 108 S.Ct. at 402.[11] The court's deference to the legislation enacted by Congress is evident throughout the *Langley* decision,[12] and should serve as a guide for this Court in denying the FDIC's effort to create a priority which appears nowhere on the face of the Federal Deposit Insurance Act. We therefore find that the FDIC is not entitled to a priority over the shareholders by virtue of its status as the insurer of the failed Park Bank.

### B. Common Law Priority of FDIC as General Creditor

The FDIC argues that if it is not entitled to a priority under the statutory scheme of the Federal Deposit Insurance Act, this Court should consider fashioning a federal common law absolute priority rule. For the reasons stated below, we decline to create such a rule.

The absolute priority rule evolved out of the bankruptcy principle that a debtor re-

---

**11.** The Court went on to note that "[e]ven if we had the power to do so, the equities petitioners invoke are not the equities the statute regards as predominant." *Langley,* 484 U.S. at 94, 108 S.Ct. at 402.

**12.** The Court stated "[t]he short of the matter is that Congress opted for the certainty of the

requirements set forth in section 1823(e). An agreement that meets them prevails even if the FDIC did not know of it; and an agreement that does not meet them fails even if the FDIC knew. It would be rewriting the statute to hold otherwise." *Langley,* 484 U.S. at 95, 108 S.Ct. at 403.

ceives distribution only after all creditors have been satisfied. The rule applies to equity contributions in corporations by requiring that the providers of the equity (the stockholders) not seek recovery of corporate assets until general creditors' claims have been satisfied. *In re Perimeter Park Investment Associates, Ltd.*, 697 F.2d 945, 952 n. 8 (11th Cir.1983). "Secured creditors get first priority according to their rank and the unsecured creditors follow." *Id.* "All members of a higher priority class must be paid in full before lower priority classes can be paid." *Id.*

In the present case, however, the shareholders are not attempting to collect on assets of the failed bank. Rather, they are proceeding against solvent third-parties in non-derivative shareholder suits. Although no consensus has yet evolved as to the rights of shareholders in such a situation, the 1978 revision of the Bankruptcy Code (Amended 1984) arguably approves of the position that such shareholders may proceed in suits against third parties on an equal status with general creditors. *See* 11 U.S.C. section 510(b) (1987).[13] The express terms of section 510(b) of the 1978 Bankruptcy Code apply only to claims against the debtor or an affiliate of a debtor. While we hesitate to formulate a broad holding under the present factual setting which may prohibit future courts from making different interpretations of section 510(b) under different factual situations, it appears that Congress did not intend to prohibit shareholders from proceeding against third parties when it passed section 510(b).

The FDIC must therefore derive its priority from some other source besides the absolute priority over equity contributors.

The FDIC suggests that this court may create a priority under the federal common law. For the reasons stated below, we decline to create such a rule in this case.

■ The FDIC urges this Court to utilize the framework of *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726–27, 99 S.Ct. 1448, 1457–58, 59 L.Ed.2d 711 (1979) to fashion a federal common law rule of priority.[14] As the Supreme Court stated in *Kimbell Foods*, before undertaking the task of formulating federal common law, a court must consider: (1) whether a federal program is such that it requires a uniform national rule; (2) whether application of state law would frustrate *specific* objectives of the federal program; and (3) whether application of a federal rule would disrupt commercial relationships predicated on state law. *Id.* at 728–29, 99 S.Ct. at 1458–59. The Court noted that its function in creating federal common law should be "to effectuate congressional policy." *Id.* at 738, 99 S.Ct. at 1464.

The Court in *Kimbell*, examining the need for a federal common law rule concerning priority rules on contractual liens by the Small Business Administration (SBA) or security interests taken by the Farmers Home Administration (FHA), concluded that national uniformity of priority rules was unnecessary to protect the federal interests behind the SBA and FHA loan programs. *Id.* at 729–32, 99 S.Ct. at 1459–61. The Court made this finding in spite of the government's argument that "applying state law to these lending programs would undermine its ability to recover funds disbursed and therefore would conflict with program objectives."[15] *Id.* at 733, 99 S.Ct. at 1461.

**13.** Section 510(b) provides:
For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

**14.** When the FDIC is acting in its corporate capacity, as it does when it purchases assets from the FDIC as a receiver, it is subject to federal common law. *Trigo v. FDIC*, 847 F.2d 1499, 1502–03 (11th Cir.1988).

**15.** The decision in *Kimbell Foods* is not parallel to the present case in that the FDIC cannot be said to have voluntarily assumed the risks to the deposit insurance fund posed by Park Bank, as the Supreme Court suggested that the SBA and FHA voluntarily entered into transactions with their defaulters. The FDIC replenishment of

The problem with applying a federal common law rule in this case is that the Federal Deposit Insurance Act does not compel the FDIC to pursue claims to restore the deposit insurance fund against third parties who may have harmed a failed bank. In *Gunter,* where a federal common law rule was formulated, the specific goal served by adopting the rule was allowing the FDIC to conduct an accurate cost test before engaging in a purchase and assumption transaction. *Gunter,* 674 F.2d at 869–70. Because of the nature of the analysis performed preceding a purchase and assumption transaction and the near impossibility of assessing overnight the value of potential lawsuits against third parties, the same need cannot be found with regard to potential lawsuits against third parties. The FDIC's argument that its mission is to maximize the recovery to the fund does not change the paramount consideration which all courts addressing the issue have found—that the cost test preceding a purchase and assumption transaction is performed quickly and with high reliance on the books and records of the failing bank. Of course, it would be convenient to the FDIC to have an arsenal of priorities, presumptions and defenses to maximize recovery to the insurance fund, but this does not require that courts must grant all of these tools to the FDIC in its effort to maximize deposit insurance fund recovery. Any rule fashioned must have its base on the goal of effectuating congressional policy. We are not convinced that Congress considered collections against parties such as the bank-related defendants in this case as a necessary part of the recovery to the deposit insurance fund. Any such priority over third-party lawsuits will have to come from Congress, not this Court.

### III.

The appellants argue that the judgment entered by the district court violates the Anti–Injunction Act, 28 U.S.C. § 2283. We see no need to prolong this opinion by any extended discussion of this question. Our reversal of the district court for the reasons stated above will prompt the district court to vacate his previously issued injunction, and thereafter dismiss this action unless there are other issues which may require resolution by the trial court.

### IV.

For the reasons stated above, we REVERSE the decision of the district court insofar as it created a priority for the FDIC over the claims of the shareholders and REMAND this case for further proceedings consistent with this opinion.

IT IS SO ORDERED.

the fund, however, also does not rise to the level of tax liens. The court stated "vital to the functioning, indeed existence, of government," that collection of taxes is and would therefore be the type of area where a court may create federal common law. *Kimbell Foods,* 440 U.S. at 734, 99 S.Ct. at 1461. The present case is thus not as clear as the situation decided in *Kimbell Foods,* nor as compelling as the alternative presented by the Court.