**RESOLUTION TRUST CORPORATION, Plaintiff,**

v.

**HOLLAND & KNIGHT, Defendant.**

No. 92–2721–Civ.

United States District Court, S.D. Florida.

Aug. 26, 1993.

---

Richard H. Critchlow, Brian F. Spector, Deborah A. Sampieri, Christina L. Riotte, Kenny Nachwalter Seymour Arnold & Critchlow, P.A., Miami, FL, for defendant.

Lowell E. Sachnoff, Barry S. Rosen, Candace J. Fabri, Sachnoff & Weaver, Ltd., Chicago, IL, Alan J. Kluger, Marcia Soto Canner, Kluger, Peretz, Kaplan & Berlin, P.A., Miami, FL, Sara Nelson Bloom, Resolution Trust Corp., Legal Div., Washington, DC, for plaintiff.

### ORDER DENYING PLAINTIFF'S MOTION TO STRIKE

HIGHSMITH, District Judge.

THIS CAUSE came before the Court upon Plaintiff's Motion to Strike Defendant's First, Second, Third, Ninth and Eleventh affirmative defenses.

### STANDARD OF REVIEW

*Fed.R.Civ.P.* 12(f) provides in pertinent part, "Upon motion made by a party ... the court may order stricken from any pleading any insufficient defense." Motions filed pursuant to Rule 12(f) are viewed with disfavor and are infrequently granted because striking a portion of a pleading is a drastic remedy, and because such remedies are often sought by the movant simply as a dilatory tactic. 5A Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1380 (2d ed. 1990).[1]

The challenging party must demonstrate that "the allegations being challenged are so unrelated to the plaintiff's claims as to be unworthy of any consideration as a defense and that their presence in the pleading throughout the proceeding will be prejudicial to the moving party." *Id.* An affirmative defense should only be stricken if "it clearly appears that the plaintiff would succeed despite any stated facts which could be proved in support of the defense." *FDIC v. Eckert Seamans Cherin & Mellott*, 754 F.Supp. 22, 23 (E.D.N.Y.1990). "Where the defense is insufficient as a matter of law, the defense should be stricken to eliminate the delay and unnecessary expense from litigating the invalid claim." *Id.* at 23 (citations omitted). In addition, the court should strike only those portions of the answer that are insufficient. Wright and Miller, *Federal Practice and Procedure* at § 1380.

### PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff Resolution Trust Corporation ("RTC") filed this action as successor in interest to CenTrust Savings Bank ("CenTrust"), seeking $10 million in damages from Defendant Holland & Knight for legal malpractice and breach of fiduciary duty.[2] Ac-

---

1. *See, e.g., Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors, Pty. Ltd.*, 647 F.2d 200, 201 (D.C.Cir.1981); *Brown v. Seebach*, 763 F.Supp. 574, 583 (S.D.Fla.1991); *U.S. v. Marisol, Inc.*, 725 F.Supp. 833, 836 (M.D.Pa.1989); *Poston v. American President Lines, Ltd.*, 452 F.Supp. 568, 570 (S.D.Fla.1978).

2. In 1990, federal regulators appointed the RTC as conservator, and subsequently receiver, for CenTrust, which collapsed at a cost to taxpayers of $1.7 billion. Teri Agins, *RTC Pursues Paul Weiss*, Wall Street Journal, August 9, 1993, at B2. The RTC has filed two additional actions related to CenTrust's collapse. In a suit filed in November, 1990, the RTC is seeking $250 million in damages from CenTrust's officers and directors for alleged breach of fiduciary duty, waste and mismanagement. The RTC also filed a negligence suit earlier this year against the accounting firm of Deloitte & Touche for alleged improp-

cording to the Complaint, David Paul became the principal shareholder and Chairman of the Board of Directors of Dade Savings & Loan, CenTrust's predecessor, in 1983, after agreeing to transfer $32 million worth of assets of Westport Company ("Westport"), an investment trust owned by Paul, to Dade Savings & Loan. The RTC also alleges that David Paul Properties, Inc. ("DPPI"), a newly formed corporation capitalized at seven million dollars and wholly owned by Paul, agreed to guarantee the value of Westport's assets upon liquidation. Pursuant to this agreement, Paul allegedly promised to keep DPPI's assets liquid and unpledged, invested only in certificates of deposit, bank accounts, or marketable securities. The RTC claims, however, that Paul subsequently liquidated most of DPPI's assets to build the Grand Cru, Paul's seven-million dollar luxury yacht.

The Federal Home Loan Bank Board ("FHLBB") approved these transactions in 1983, but in March, 1989, the FHLBB asked CenTrust to investigate the obligations of DPPI and Paul under the guaranty agreement. In response, CenTrust formed the CenTrust Special Committee ("Committee"), which was composed of members of CenTrust's Board of Directors. The Committee hired Holland & Knight to analyze CenTrust's rights and remedies under the guaranty agreement. Holland & Knight concluded that Paul and DPPI had no liability under the guaranty agreement. The RTC claims that this conclusion led the Committee to abstain from filing a lawsuit against Paul or DPPI for breach of the guaranty agreement.

In this action, the RTC alleges that Holland & Knight was both incompetent and disloyal in its representation of CenTrust. Specifically, the RTC alleges that Holland & Knight: (1) misconstrued the guaranty agreement; (2) overvalued Westport's assets; (3) failed to find that DPPI was liable to CenTrust; and (4) failed to discover Paul's personal liability under the guaranty agreement.

In its Answer, Holland & Knight has asserted seventeen affirmative defenses. The RTC's motion seeks to strike the following five affirmative defenses:

(1). *First Defense:* Assuming Plaintiff suffered any damages, which is denied, such damages were caused or were contributed to by actions (or inaction) of CenTrust, the RTC, OTS, FHLBB, Florida Department of Banking and Finance or other regulatory agencies (hereinafter, with the exclusion of CenTrust, referred to jointly as the "regulators").

(2). *Second Defense:* Plaintiff's claims are barred by waiver, ratification and estoppel in that the regulators had knowledge of and ratified the substance of Holland & Knight's advice during Holland & Knight's performance of services for the Committee.

(3). *Third Defense:* Plaintiff's claims are barred by waiver, ratification, laches and estoppel in that after Holland & Knight rendered its advice and legal services to the Committee, and after the Committee based its Report on such advice and services, and after the Board of Directors of CenTrust accepted the Report, *on the face of which all matters of which Plaintiff complains are apparent,* the OTS and RTC continued to employ Holland & Knight on hundreds of matters, including more than a hundred matters relating to CenTrust; and, further, in connection with the investigation leading to this lawsuit, the OTS assured Holland & Knight that its continued employment by the OTS and RTC should obviate any concern by Holland & Knight that the OTS and RTC were dissatisfied with Holland & Knight's

---

er auditing. In addition, the RTC is currently engaged in settlement discussions with the New York law firm of Paul, Weiss, Rifkin, Wharton & Garrison, which represented CenTrust and David Paul prior to CenTrust's collapse. *Id.*

The RTC's voluminous legal maneuvers in this matter are not surprising. "With losses to taxpayers from thrift failures now in excess of $80 billion, the RTC has filed hundreds of lawsuits against former officers and directors of thrifts and against their lawyers and accountants, generally alleging widespread failure to catch wrongdoing." Richard M. Weintraub, *Collections by the RTC Approaching $400 Million,* Washington Post, August 7, 1993, at B1. In recent years, the RTC has collected nearly $400 million from lawyers, accountants and others (so-called "third-party professionals") who worked for failed savings and loan associations. *Id.*

services to the Committee or were considering filing a claim against Holland & Knight based on these services.

(4). *Ninth Defense:* Plaintiff's claims are barred by, or should be reduced by, the OTS's comparative negligence in the conduct and handling of the issues relating to CenTrust, DPPI and Paul.

(5). *Eleventh Defense:* While Holland & Knight denies Plaintiff any damage, Plaintiff failed to mitigate damages incurred after Plaintiff knew or should have known of any alleged wrongdoing, and any damages to which Plaintiff may be entitled must be reduced by the amount by which such damages would have been mitigated.

(Holland & Knight's Answer and Defenses, D.E. # 12, at 18–21).

## DISCUSSION

### A. Regulatory Scheme

On August 9, 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), a comprehensive overhaul of the nation's banking regulation statutes. Pub.L. No. 101–73, 103 Stat. 183 (codified at various sections of United States Code, Titles 12 and 18 (1989)). Prior to the enactment of FIRREA, the Federal Savings and Loan Insurance Corporation ("FSLIC") insured deposits of savings and loan associations under the supervision of the Federal Home Loan Bank Board ("FHLBB"). FIRREA, however, abolished the FHLBB and the FSLIC and transferred the FHLBB's regulatory powers to the Office of Thrift Supervision ("OTS"). 12

U.S.C.A. § 1437 (West Supp.1993) (Historical and statutory note).[3] FIRREA also transferred the FSLIC's assets and liabilities to the FSLIC Resolution Fund and transferred the FSLIC's insurance functions to the Federal Deposit Insurance Corporation ("FDIC"). 12 U.S.C.A. § 1821a (West Supp. 1993).[4]

The RTC was created to manage and resolve failed savings and loan associations previously insured by the FSLIC or in receivership or conservatorship after January 1, 1989 and before October 1, 1993. 12 U.S.C.A. § 1441a(b)(3)(A) (West Supp.1993).[5] The RTC has the same powers as the FDIC in its capacities as conservator, receiver, or corporation, pursuant to the Federal Deposit Insurance Act ("FDIA"). 12 U.S.C.A. § 1441a(b)(4) (West Supp.1993).[6] Moreover, the FDIC manages the RTC, and the RTC's Board of Directors is identical to the FDIC's Board of Directors.[7] Under this regulatory framework, a federally-assisted acquisition of a savings and loan association involves numerous federal agencies including the OTS and the RTC. *See* Julie L. Williams, *Savings Institutions: Mergers, Acquisitions and Conversions* § 10.01–02 (5th ed. 1991).

### B. Public Policy Underlying Regulatory Scheme

Several federal courts have interpreted the regulatory scheme embodied in FIRREA in cases brought by the RTC or the FDIC against officers and directors of failed banking institutions and third-party professionals employed by failed banking institutions.[8]

---

3. These regulatory powers include determining if grounds exist to appoint the RTC and approving the RTC's acquisition transactions.

4. Before this transfer, the FDIC only insured commercial bank deposits.

5. After October 1, 1993, the FDIC will be appointed to manage and resolve these savings and loan crises. 12 U.S.C.A. § 1821(c)(6)(B) (West Supp.1993). In addition, the RTC is scheduled to terminate on December 31, 1996.

6. The FDIC and RTC, as conservator or receiver, succeed to all of the powers of the stockholders, members, account holders, depositors, officers or directors of the failed institution. 12 U.S.C.A. §§ 1821(d)(2)(A), (B), and (C) (West 1989 & Supp.1993).

7. The Court will analyze decisions involving the FDIC or FSLIC that are relevant to this dispute because the RTC, FDIC and FSLIC function similarly in their capacities as receiver, conservator or corporation. *See RTC v. Youngblood*, 807 F.Supp. 765, 771 (N.D.Ga.1992).

8. *See FDIC v. Stanley*, 770 F.Supp. 1281, 1309 (N.D.Ind.1991); *FDIC v. Eckert Seamens Cherin & Mellott*, 754 F.Supp. 22, 25–26 (E.D.N.Y. 1990); *FDIC v. Baker*, 739 F.Supp. 1401, 1407 (C.D.Cal.1990); *FDIC v. Greenwood*, 719 F.Supp. 749, 750–51 (C.D.Ill.1989); *FDIC v. Burdette*, 718 F.Supp. 649, 663 (E.D.Tenn.1989); *FDIC v. Carlson*, 698 F.Supp. 178, 179 (D.Minn.1988); *FDIC v. Butcher*, 660 F.Supp. 1274 (E.D.Tenn. 1987).

These courts have determined that FIRREA's broad public policy underpinnings require the rapid and efficient conversion of a failed banking institution's assets to cash to repay the losses incurred by the insurance fund and by uninsured depositors. *See Eckert Seamans Cherin & Mellott,* 754 F.Supp. at 25. A number of courts have further concluded that, to accomplish this rapid conversion of assets, the RTC or the FDIC must be treated differently than an ordinary plaintiff in a civil case. *Burdette,* 718 F.Supp. at 664.

The rationale for this public policy determination is that the role of the FDIC and the RTC, as conservator or receiver, is limited to the following tasks:

(i). Take over the assets of and operate the insured depository institution with all the powers of the members or shareholders, the directors, and the officers of the institution and conduct all business of the institution;

(ii). Collect all obligations and money due the institution;

(iii). Perform all functions of the institution in the name of the institution which is consistent with the appointment as conservator or receiver; and

(iv). Preserve and conserve the assets and property of such institution.

12 U.S.C.A. § 1821(d)(2)(B) (West 1989). In light of this limited grant of power to the RTC and the FDIC, many courts have chosen not to expand the RTC and FDIC's

responsibilities to encompass a duty to those parties who previously controlled the failed banking institution.[9]

In keeping with this public policy determination, a number of courts have developed an "immunity" rule that holds that the RTC and the FDIC are immune from affirmative defenses. *Burdette,* 718 F.Supp. at 662.[10] As stated by the *Burdette* court:

> The rule that there is no duty owed to the institution or wrongdoers by the [RTC]/Receiver is simply a means of expressing the broad public policy that the banking laws creating the [RTC] and prescribing its duties are directed to the public good, and that every separate act of the [RTC] as a receiver in collecting assets is not open to second guessing in actions to recover damages from wrongdoing directors and officers. If there is no wrongdoing by the officer or director, there can be no liability, but if wrongdoing is established, the officer or director should not be allowed to set up as a defense a claim that would permit the detailed examination of the [RTC's] action as a receiver.

*Burdette,* 718 F.Supp. at 663. *See also Eckert Seamans Cherin & Mellott,* 754 F.Supp. at 25.

### C. Applicability of the Public Policy "Immunity" Rule to Third–Party Professionals

In its motion to strike affirmative defenses, the RTC argues that this public policy "immunity" rule prohibits Holland & Knight, a

---

**9.** *See, e.g., Greenwood,* 719 F.Supp. at 750 ("Public policy concerns mandate a finding that the duty of the FDIC to collect on assets of a failed institution runs to the public and not to the former officers and directors of the failed institution."); *Burdette,* 718 F.Supp. at 664 ("Whether a duty is owed by the FSLIC to the defendants in this case or not, the policy against having the public bear any losses due to errors in judgment by the FSLIC as a receiver of a failed financial institution still applies."); *Carlson,* 698 F.Supp. at 179 ("The FDIC's purpose is to stabilize the banking industry and promote public confidence in banks and therefore, its duty is to the general public not individual banks, directors, or officers."); *FSLIC v. Roy,* 57 USLW 2099, 1988 WL 96570, *1 (D.Md. June 28, 1988) ("FSLIC owes no duty to those institutions or to those whose negligence has brought them to the brink of disaster.").

**10.** *See also FDIC v. Isham,* 782 F.Supp. 524, 532 (D.Colo.1992) ("FDIC's own conduct cannot be used to defeat or reduce a recovery to the insurance fund because the FDIC does not act to benefit bank officers and directors."); *FDIC v. Coble,* 720 F.Supp. 748, 750 (E.D.Mo.1989) (Court struck affirmative defenses because the alleged negligent conduct of the FDIC and the period in which the FDIC controlled the bank did not coincide). *But see FDIC v. Ashley,* 749 F.Supp. 1065, 1068–69 (D.Kan.1990) (Officers and directors of a failed bank may assert mitigation of damages as an affirmative defense.); *FDIC v. Carter,* 701 F.Supp. 730, 737–38 (C.D.Cal.1987) (Officers and directors may assert relevant defenses when the FDIC acts in its proprietary capacity.).

third-party professional, from raising the affirmative defenses that are the subject of this motion.[11] Officers and directors, unlike third-party professionals, are employees of the financial institution with control and oversight responsibilities over the institution's transactions. 12 U.S.C.A. §§ 1821(d)(2)(A)–(C) (West 1989 & Supp. 1993). Therefore, public policy dictates that officers and directors should not be permitted to shield their past activities behind a veil of institutional approval. *FDIC v. Jones, Day, Reavis & Pogue*, No. A. 90–CA–925, at 19 (W.D.Tex. Feb. 19, 1992), *adopted and approved*, (Feb. 26, 1992).

Third-party professionals, however, do not have the control or oversight responsibilities of officers and directors. *Jones, Day*, No. A. 90–CA–925 at 19. Consequently, the issue of whether third-party professionals should be able to assert affirmative defenses is more difficult. As a result, the Court concludes that the case law addressing the validity of affirmative defenses raised by officers and directors is inapposite to this case, and the Court will limit its discussion to those cases involving third-party professionals.[12]

The federal courts are split on the issue of whether third-party professionals may assert affirmative defenses against the RTC or FDIC. Several courts, following the reasoning of the *Burdette* court, have expressly held that third-party defendants cannot assert affirmative defenses against the RTC or the FDIC because there is no difference between officers and directors and third-party professionals.[13] *See, e.g., FDIC v. Ernst & Whinney*, No. 3–87–0364, 1992 WL 535605 (E.D.Tenn. May 19, 1992) (accountants); *FDIC v. Baker*, 739 F.Supp. 1401 (C.D.Cal. 1990) (appraisers). In *Ernst & Whinney*, the court, relying on a public policy analysis, decided that:

> Public policy militates against judicial second-guessing of FDIC's actions or requiring the public at large to bear the costs of FDIC dealing with the intricacies of disposing of the assets of a failed bank. This policy applies regardless of whether the defendant in any particular law suit brought by the FDIC was an insider with respect to the closed institution which is the source of the cause of action, such as a

---

11. The FDIC, FSLIC and RTC often adopt one or more of the following additional arguments to serve as a shield from liability:

(1). The FDIC is not subject to a borrower's defenses that banking officials orally promised to disregard a note or alter the liability on a note. *See D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 460–62, 62 S.Ct. 676, 680–81, 86 L.Ed. 956 (1942); *In Re NBW Commercial Paper Litigation*, 826 F.Supp. 1448 (D.D.C. 1992).
(2). Congress intended the FDIC to have absolute priority over other creditors and borrowers when employing the cost test as part of a purchase and assumption agreement. *See FDIC v. Jenkins*, 888 F.2d 1537 (11th Cir. 1989).
(3). Federal common law, based upon a policy analysis, precludes liability. *See FSLIC v. Burdette*, 718 F.Supp. 649 (E.D.Tenn.1989).
(4). The FDIC is protected by the discretionary function exception to the Federal Tort Claims Act ("FTCA"). 28 U.S.C.A. §§ 1346(b), 2671–80 (West 1965, 1976 & Supp.1993). *See United States v. Gaubert*, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991).
*See* Murray B. Silverstein and Steven J. Wein, *Failed Financial Institutions: The Plight of Professionals Defending Regulators' Claims—The 11th Circuit's Approach*, 66 Fla B.J. 11 (February 1992). In this case, however, the RTC has based

its argument solely on public policy. Therefore, the Court will only analyze the public policy issues addressed by the parties in their memoranda. The Court also notes that it finds that the FTCA and the *D'Oench* doctrine are inapposite to this matter because Holland & Knight's affirmative defenses do not involve loans and are not "claims against the United States for money damages." 28 U.S.C.A. § 1346(b) (West 1976 & Supp.1993).

12. *See also* Silverstein & Wein, *Failed Financial Institutions* ("A professional providing services to a financial institution cannot be compared to a director or officer of the institution or one of the institution's borrowers.... At best, the FDIC should be treated as an assignee, subject to all defenses that could have been raised against the assignor. To do otherwise relegates the professional to second class litigant and insurer of losses suffered by a failed financial institution.").

13. A few courts have failed to specifically address the differences between third-party professionals and officers and directors when striking third-party professionals' affirmative defenses. *See, e.g., In Re Sunrise Securities Litigation*, 818 F.Supp. 830 (E.D.Pa.1993); *FDIC v. Lowe*, 809 F.Supp. 856 (D.Utah 1992); *FDIC v. Eckert Seamans Cherin & Mellott*, 754 F.Supp. 22 (E.D.N.Y. 1990).

director or officer, or an outsider, such as an auditor.

*Ernst & Whinney,* No. 3–87–0364, at 3 (E.D.Tenn. May 19, 1992) (citation omitted).

On the other hand, several courts have expressly held that third-party professional defendants are permitted to assert affirmative defenses against the FDIC or RTC.[14] *See, e.g., FDIC v. Jones, Day, Reavis & Pogue,* No. A.90–CA–925 (W.D.Tex. Feb. 19, 1992), *adopted and approved,* (Feb. 26, 1992) (attorneys); *FDIC v. Cherry, Bekaert & Holland,* 742 F.Supp. 612 (M.D.Fla.1990) (accountants). In *Jones, Day,* the court distinguished officers and directors from third-party professionals, namely attorneys, noting that:

> Outside parties should not have the "no duty rule" set forth in *Burdette* apply to them because they do not have the control or oversight function or responsibilities of the officers and directors.... The rationale for the no duty rule as set forth in *Burdette* is nonsensical once a party loses the ability to control or oversee the activities of the institution.

*Jones, Day,* No. A.90–CA–925, at 19–20.[15]

### D. Eleventh Circuit Case Law

The issue of whether the RTC should be immune from affirmative defenses in an action against third-party professionals, rather than officers or directors, is an issue of first impression in the Eleventh Circuit. The Eleventh Circuit has, however, in two cases, addressed the status of the FDIC in actions brought subsequent to the failure of financial institutions. *See FDIC v. Harrison,* 735 F.2d 408, 409 (11th Cir.1984); *FDIC v. Jen-*

kins, 888 F.2d 1537, 1538 (11th Cir.1989). These two cases clearly suggest that the Eleventh Circuit does not take an expansive view of the public policy considerations underlying the passage of FIRREA.

In *FDIC v. Harrison,* the Eleventh Circuit, affirming the district court's decision, held that the FDIC was equitably estopped from asserting an action to enforce guaranties against debtors of a failed bank. *Id.* at 410, 413 ("The FDIC is subject to a claim of equitable estoppel when it acts in its corporate capacity to collect a debt acquired from an insolvent bank."). The court based its decision on evidence that the FDIC told the original guarantors that they would not be responsible for repayment of the guaranties. Specifically, the court concluded that when the FDIC acts in its corporate capacity to collect debts, its liability must be determined in the same fashion as that of a private party. *Id.* at 412–13. "When the FDIC acts as a receiver and liquidating agent for a failed bank as it did here, it merely 'stands in the shoes of the insolvent bank.'" *Id.* at 412 (citation omitted). The court further noted that:

> The special protection ... is afforded only when necessary to further the policy of promoting the stability of the nation's banking system by facilitating [the] FDIC's smooth acquisition of assets in a purchase and assumption transaction.[16] It is essential that the [FDIC] be able to acquire assets of a failed bank without fear of unknown defenses that may have been valid against the bank. Such protections are not necessary where, as here, the con-

14. Some of these courts have also failed to expressly discuss the differences between third-party professionals and officers or directors. *See, e.g., FDIC v. Ernst & Young,* 1991 WL 197111 (N.D.Tex. Sept. 30, 1991), *aff'd,* 967 F.2d 166 (5th Cir.1992); *FDIC v. Williams,* No. CA.3–91–1428 (N.D.Texas March 6, 1992).

15. This court has also found one brief opinion in which a federal district court both applied the policy argument to third-party professionals' affirmative defenses against the FDIC but permitted assertion of the defenses. In *FSLIC v. Vineyard,* No. CA.3–88–0130–C (N.D.Tex. July 25, 1988), the court concluded that the policy that the FSLIC has no duty to warn, detect or deter

wrongful conduct of a regulated bank applies to professionals as well as directors and shareholders. The court, however, also found that defenses may be applicable through some other function of the FSLIC such as assignee.

16. When the FDIC becomes receiver of a bank, it has two alternatives: (1) a "deposit payoff," where the FDIC closes the bank and pays the depositors pursuant to statutory limits; or (2) a "purchase and assumption" transaction, where the FDIC sells the assets and liabilities of the failed bank to another bank. *FDIC v. Jenkins,* 888 F.2d 1537, 1539–40 (11th Cir.1989).

duct of [the] FDIC itself gave rise to the defense.

*Id.* at 412 n. 6. It is important to note that the *Harrison* court considered precisely whether defendants may assert affirmative defenses against the FDIC.

In *FDIC v. Jenkins,* the Eleventh Circuit also addressed the issue of FDIC immunity in a case where the FDIC brought an action against the shareholders of a failed bank. Previously, both the FDIC and the shareholders had filed separate actions against the officers, directors and attorneys of the bank. The FDIC sought a declaratory judgment that the FDIC was entitled to priority over the shareholders' claims because the FDIC had absolute priority over all other creditors of the failed bank. *Jenkins,* 888 F.2d at 1540–41. The Eleventh Circuit, however, stated, "We cannot approve of judicial expansion of the express powers and rights granted to the FDIC ... by Congress." *Jenkins,* 888 F.2d at 1541. The court found that the FDIA did not intend to grant the FDIC absolute priority over other creditors. "In ... more normal, commercial contexts, we see no reason to relieve the FDIC from the ordinary operation of state law." *Jenkins,* 888 F.2d at 1544 (citation omitted).

### E. FDIC v. Cherry, Bekaert & Holland

The Middle District of Florida, relying on *Harrison* and *Jenkins,* recently concluded that a third-party professional could raise affirmative defenses against the RTC. *FDIC v. Cherry, Bekaert & Holland,* 742 F.Supp. 612 (M.D.Fla.1990). In *Cherry, Bekaert,* the FDIC brought an action against Cherry, Bekaert & Holland, an accounting firm, for an alleged negligent audit of the bank. The accountants raised the affirmative defenses of comparative and/or contributory negligence and failure to mitigate damages against the bank's officers and directors for actions taken before receivership of the bank, and the accountants raised the same affirmative defenses against the FDIC for actions taken after the bank was placed in receivership.

The court, analyzing *Harrison* and *Jenkins,* noted that:

Although the FDIC is protected from defenses of fraud on the part of the failed bank, or oral agreements between the borrower and the failed bank, defenses often asserted by borrowers when the FDIC seeks to collect on defaulted loans, this protection is afforded only when necessary to further the policy of promoting the stability of the nations banking system by facilitating the FDIC's smooth acquisition of assets in a purchase and assumption transaction.

*Cherry, Bekaert,* 742 F.Supp. at 613 (quoting *Harrison,* 735 F.2d at 413 n. 6). In addition, the *Cherry, Bekaert* court noted that "when the FDIC acts to dispose the assets of the bank, these actions fall outside the public policy role of the FDIC and may serve as a basis for a counterclaim and affirmative defenses." *Cherry, Bekaert,* 742 F.Supp. at 614 (quoting *FDIC v. Carter,* 701 F.Supp. 730 (C.D.Cal.1987)).

The RTC argues that *Cherry, Bekaert* has been rejected and discredited by other federal district courts. *See, e.g., In re Sunrise Securities Litigation,* 818 F.Supp. 830 (E.D.Pa.1993); *FDIC v. Crosby,* 774 F.Supp. 584 (W.D.Wash 1991). The Fifth Circuit, however, recently cited *Cherry, Bekaert* with approval in an action involving similar issues between federal regulators and an accounting firm. *FDIC v. Ernst & Young,* 967 F.2d 166, 170 (5th Cir.1992). In *Ernst & Young,* the FDIC brought an action against Ernst & Young, the former accountants of Western Savings Association, for negligence and breach of contract. Relying upon *Cherry, Bekaert,* the district court concluded that the FDIC should be treated as an ordinary private plaintiff. *Id.* at 169. The Fifth Circuit agreed with the district court's interpretation of *Cherry, Bekaert,* and, citing *Harrison* and *Jenkins,* affirmed the district court's decision. "The FDIC is not entitled to special protection when it brings a tort claim against a third party on behalf of a defunct financial entity." *Id.* at 170.

### F. Application of Eleventh Circuit Case Law & Cherry, Bekaert to Third–Party Professionals

When applied to third-party professionals, these Eleventh Circuit decisions clearly un-

dermine the rationale underlying the *Burdette* court's public policy theory. In *Harrison* and *Jenkins*, the Eleventh Circuit took a narrow view of the public policy underpinnings of FIRREA and suggested that the RTC should be treated as an ordinary private plaintiff in select circumstances. Therefore, based on the foregoing analysis of the case law, the Court concludes that public policy considerations are irrelevant to actions involving third-party professionals and should not bar third-party professionals from asserting affirmative defenses against the RTC. In other words, the Court will treat the RTC as an ordinary private plaintiff in this action.

The Court has noted that the RTC's motion to strike concentrates on whether Holland & Knight may assert any affirmative defenses against the RTC. The motion does not, however, discuss the viability of each individual affirmative defense. Therefore, the Court notes that it would be premature at this juncture for the Court to address the validity of each of Holland & Knight's individual affirmative defenses. In this Order, the Court only holds that Holland & Knight is permitted to raise affirmative defenses against the RTC.

## CONCLUSION

Based on the foregoing, it is hereby

ORDERED AND ADJUDGED that Plaintiff's Motion to Strike is DENIED.

DONE AND ORDERED.