**NATIONAL CREDIT UNION ADMINISTRATION**

v.

**FIRST UNION CAPITAL MARKETS CORP., et al.**

No. Civ. WMN–97–4222.

United States District Court,
D. Maryland.

Aug. 4, 1999.

Richard S. Kraut, Ralph Drury Martin, Storch & Brenner, of Washington, DC, for plaintiff.

James B. Moorhead, Filiberto Agusti, Steptoe & Johnson, of Washington, DC, for defendants.

### MEMORANDUM AND ORDER

GAUVEY, United States Magistrate Judge.

This case arises out of the sale of collateralized mortgage obligations (CMOs) and repurchase agreements that occurred between September 1993 and January 1995. During that time period the defendants, First Union Capital Markets Corp. (First Union) and John FitzHugh, sold the aforementioned securities to Capital Corporation Federal Credit Union, of Lanham, Maryland (CapCorp). In 1993 and 1994 CapCorp heavily invested in CMOs. In August 1993, 57% of CapCorp's investment portfolio (reflecting a value of $541 million) consisted of CMOs and in September 1994 that percentage rose to 75% reflecting a value of $1.1 billion. (Paper No. 48 at 2). The rise in interest rates that occurred in 1994 significantly decreased the marketability of CapCorp's CMOs. Accord-

ingly, CapCorp's investment portfolio suffered an unrealized loss of approximately $100 million. NCUA, pursuant to 12 U.S.C. § 1786(h)(1), placed CapCorp into conservatorship on January 31, 1995. "Acting as conservator, NCUA auctioned CapCorp's securities portfolio, including the CMOs sold to CapCorp by First Union, [at a significant loss] in February 1995. On April 13, 1995, NCUA placed CapCorp into liquidation, 12 U.S.C. § 1787(b)(2) and, thereafter, acting as liquidating agent, liquidated CapCorp's remaining assets." (Paper No. 48 at 5).

On January 27, 1998, NCUA filed a five count complaint against the defendants alleging that the defendants are liable for the losses CapCorp suffered upon the sale of the CMOs purchased from the defendants. (Paper No. 1). Specifically, NCUA asserts that the defendants violated the Maryland Securities Act (Count I), intentionally concealed FitzHugh's status (Count II), negligently represented FitzHugh as a registered broker-dealer in the State of Maryland (Count III), were negligent in selling the securities to CapCorp (Count IV), and breached their fiduciary duty to CapCorp (Count V).

The defendants filed an answer on January 27, 1998. (Paper No. 2). In addition to generally denying the allegations made by the plaintiff, the defendants asserted ten affirmative defenses including, contributory negligence; estoppel; waiver; and the losses suffered by the plaintiff were directly caused by the actions of the plaintiff. (Paper No. 2 at 9–10).

By Order of Reference dated December 12, 1998, the Honorable William M. Nickerson referred to the undersigned magistrate judge the resolution of all discovery disputes.

Pending before the undersigned are three motions as follows:

(1) Plaintiff's Motion for Protective Order Regarding Deposition of Former NCUA Board Member Robert Swan (Paper No. 51);

(2) Plaintiff's Motion for Protective Order Regarding Depositions of Karen Kelbly and Leonard Skiles (Paper No. 53); and

(3) Defendant First Union's Motion For Protective Order Staying Further Deposi-

tions By Plaintiff National Credit Union Administration (Paper No. 55).

Having read the memoranda in support of these motions and the subsequently filed responses, the Court held two telephone hearings regarding these motions on Tuesday, June 29, 1999 and Wednesday, July 21, 1999. For the reasons set forth below, the Court will DENY in part and GRANT in part the plaintiff's motions and GRANT the defendant's motion.

*The Plaintiff's Motion for Protective Orders*

The plaintiff's pending motions seek a protective order to preclude the defendant from inquiring into matters that the plaintiff believes are outside the scope of allowable discovery. Specifically, the plaintiff requests the Court preclude questioning of Mr. Swan, Mr. Skiles, and Ms. Kelbly about the decision to place CapCorp in conservatorship, about the conservatorship itself, and about policy matters occurring after the imposition of the conservatorship on January 31, 1995.[1] (Paper No. 53 at 2; Paper No. 51). The defendant, on the other hand, asserts that it needs to explore these subject areas in order to obtain information relating to, *inter alia,* its affirmative defenses and causation issues.

The plaintiff originally asserted two bases for its motion regarding Mr. Swan. First, it asserted that the defendant failed to comply with federal regulations regarding requests to take testimony of former or current NCUA board members.[2] *See* 12 C.F.R. §§ 792.40–792.49 (1999). Second, the plaintiff relies on the federal common law principle known as the "no duty" rule. That is, the receivers of financial institutions have "no

duty" to wrongdoers who cause financial institutions to fail, and therefore the actions of the receivers are not relevant or at issue in suits brought by the regulatory body on behalf of the financial entity.

While the Court had some reservation about the precedence of requiring compliance with the aforementioned regulations in federal discovery, in deference to the established administrative procedure, the Court set an expedited schedule for consideration of testimony under the regulations. The defendant complied and submitted a written request dated July 1, 1999, pursuant to § 792.43, detailing twenty-one areas of inquiry addressed to Mr. Swan and sixteen areas of inquiry addressed to Mr. Carver and Mr. Hoyle. (Paper No. 60, Exhibit 1). The NCUA authorized the depositions of Mr. Swan, Mr. Hoyle, and Mr. Carver, but limited the scope of the examinations.[3] (Paper No. 60, Exhibit 2). The parties, therefore, have narrowed the controversy concerning Mr. Swan.

The plaintiff also asserts the "no duty" rule as another basis for its motion concerning Ms. Kelbly and Mr. Skiles, designated as Fed.R.Civ.P. 30(b)(6) witnesses. The plaintiff did not require the defendant to comply with 12 C.F.R. §§ 792.40–792.49; thus the issues in the attendant motion have not been narrowed. Because the resolution of both motions require an understanding of the "no duty" rule, the Court shall first address the general principles of law involved therewith. It shall then address the motions in turn.

■ Any discussion of the appropriate subjects and scope of discovery, however,

---

1. This language is suggestive of an assertion of executive privilege or the deliberative process privilege. The plaintiff, however, has failed to affirmatively assert, brief or argue such privilege to the Court, despite its inquiry. As such, the aforementioned privileges are not before this Court and will not be reached herein. *See, Franklin Savings Assoc. v. Ryan,* 922 F.2d 209 (4th Cir.1991); *Singer Sewing Machine Co. v. NLRB,* 329 F.2d 200 (4th Cir.1964); *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 40 F.R.D. 318 (D.D.C.1966); 26A Charles A. Wright & Kenneth W. Graham, *Federal Practice and Procedure Evidence* § 5680 (1992). *Cf. Virginia Beach v. United States Dept. of Commerce,* 995 F.2d 1247 (4th Cir.1993).

2. The plaintiff also required the defendant to comply with these regulations prior to deposing H. Alan Carver and Karl Hoyle, former employees of NCUA. (Paper No. 60, Exhibit 2).

3. The Hoyle and Carver depositions are not the subject of any motions before this Court. Because the legal principles are the same and in an effort to preserve judicial resources the Court notes that the rationale and ruling presented here would apply should a motion concerning the Hoyle and Carver depositions be presented to the Court.

must begin with the subject matter of the lawsuit, including the definition of the claims and defenses pending before the Court. Fed.R.Civ.P. 26(b)(1) states, in pertinent part, that:

> [p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it *relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party,*

(emphasis added).

■ "The key phrase in this definition—'relevant to the subject matter involved in the pending action'—has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978). *See also Ralston Purina v. McFarland,* 550 F.2d 967 (4th Cir.1977) (noting that the information sought must only be "germane" to the subject matter). Indeed, discovery is not limited to issues raised by the pleadings or even the merits of a case, for a variety of fact-oriented issues may arise during litigation that are not related to the merits. *Id.* Moreover, it is well understood that pursuant to Rule 26(b)(1) relevancy is construed very liberally. *Oppenheimer Fund, Inc.,* 437 U.S. at 351, 98 S.Ct. 2380, 57 L.Ed.2d 253; *Ralston Purina Co.,* 550 F.2d at 973; *Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. 1146, 1187–1188 (D.S.C.1974); *Marker v. Union Fidelity Life Insurance Co.,* 125 F.R.D. 121, 124 (M.D.N.C.1989). Relevance is not limited by the exact issues identified in the pleadings, the merits of the case, or the admissibility of the discovered information. *Marker,* 125 F.R.D. at 124. "Rather, discovery requests may be deemed relevant if there is any possibility that the information may be relevant as to the general subject matter of the action." *Id. See also Duplan Corp.,* 397 F.Supp. at 1187 ("The test is the relevancy of the subject matter which is broader than the relevancy to the issues presented by the pleadings."). Finally, "the burden of showing that the requested discovery is not relevant to the issues in this litigation is clearly on the party resisting discovery." *Spell v. McDaniel,* 591 F.Supp. 1090, 1114 (E.D.N.C.1984).

Thus, the general subject matter of the instant controversy will determine many of the disputes at issue. *See WLR Foods, Inc. v. Tyson Foods, Inc.,* 65 F.3d 1172, 1184 (4th Cir.1995) ("relevance under Rule 26 must be determined by reference to the substantive law which forms the basis of [the parties'] claims and defenses."). At a minimum, therefore, the pleadings are the starting point from which relevancy and discoverability are determined. As previously delineated, it is the defendant's affirmative defenses that give rise to the issues raised in the current motion. That is, what NCUA did, both prior to assuming control of CapCorp and as CapCorp's conservator and whether actions taken by the NCUA were either the superseding intervening cause, the actual cause, or the contributory cause of the losses here litigated.

■ While the plaintiff has stated innumerable times in its pleadings that it plans to file, pursuant to Fed.R.Civ.P. 12(f), a motion to strike the affirmative defenses, it has not done so, and any motion now would be untimely under the Rule. Thus, the affirmative defenses are still in this case and constitute part of the subject matter for which discovery is sought. Accordingly, the present posture of the case, with defendant's affirmative defenses unchallenged, informs the scope of permissible discovery.

Additionally, the discovery sought is germane to two elements of the plaintiff's claim; that is, proximate cause and damages. The plaintiff must prove that the defendant's acts (or omissions) proximately caused CapCorp's losses. "NCUA acknowledges that with respect to Counts II through V, it has the burden of establishing that defendants proximately caused the losses." (Paper No. 18 at 8 n. 5). The defendant argues that the plaintiff's acts as conservator, *i.e.,* the premature sale of the CMOs, were the actual cause of CapCorp's losses. While plaintiff is correct that defendant could make these *arguments* without this discovery, the sought after testimony may reveal opinions or data suggesting

or supporting the destabilizing effect on Cap-Corp by the rapid liquidation of the CMOs.

Furthermore, the plaintiff is seeking in excess of $15 million in damages pursuant to the five causes of action brought under Maryland law. Relevant to the ultimate quantification of damages is Maryland substantive law[4] that recognizes the doctrine of the minimization of damages; that is, the amount of damages to which a plaintiff might otherwise have been entitled are reduced to the extent that he or she failed to use all reasonable efforts to minimize the loss he or she sustained as a result of a breach of duty by the defendant. *Sergeant Co. v. Pickett,* 285 Md. 186, 203, 401 A.2d 651 (1979); *M & R Contractors & Builders, Inc. v. Michael,* 215 Md. 340, 354–355, 138 A.2d 350 (1958); *Garbis v. Apatoff,* 192 Md. 12, 20, 63 A.2d 307 (1949); *Groh v. South,* 119 Md. 297, 301, 86 A. 1036 (1913). Accordingly, "[t]he doctrine of minimization of damages is not a defense to a plaintiff's cause of action, whether that cause of action be one based in negligence or contract; rather, it is a 'disability on (or a "no right" to) recovery of reasonably avoidable damages.'" *Schlossberg v. Epstein,* 73 Md. App. 415, 421, 534 A.2d 1003, 1006 (1988) (quoting 22 Am.Jur.2d *Damages* § 30). Moreover, since the doctrine benefits a defendant, the burden of proving that a loss could have been avoided by the exercise of reasonable effort on the part of the plaintiff is upon the defendant, whose alleged breach of duty caused the damages suffered by the plaintiff. *Sergeant Co.,* 285 Md. at 203, 401 A.2d 651; *M & R Contractors & Builders,* 215 Md. at 356, 138 A.2d 350. It is significant that the doctrine is predicated, not on a duty owed by the plaintiff to the defendant, but to the public policy that persons should be discouraged from wasting their resources, both physical and economic. *Schlossberg,* 73 Md.App. at 422, 534 A.2d at 1007. Ultimately, the question becomes whether the defendant was able to prove that the plaintiff failed to take reasonable steps to minimize the amount or extent of its damages. Necessarily involved in the resolution of such an issue is the reasonableness of the plaintiff's actions and the motive or intent giving rise thereto.

In the instant case the defendant asserts that the sale of the CMOs was premature and had the plaintiff held them to maturity the complained of losses would not have been incurred. As explained above, the burden is on the defendant to prove that the plaintiff did not take reasonable steps to minimize the amount of loss realized by the sale of the CMOs. The sought after testimony may lead to the discovery of facts tending to prove the extent to which the plaintiff used all reasonable efforts to minimize the losses sustained as a result of a breach of duty by the defendant.

The Court is also aware that while Rule 12(f) requires the plaintiffs to file the motion to strike within 20 days after receipt of the answer (which has long since passed), the rule also allows the court, "upon the court's own initiative at any time" to strike any "insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). *See Federal Deposit Ins. Corp. v. British–American Corp.,* 744 F.Supp. 116, 117 (E.D.N.C.1990).

■ A motion to strike defenses, however, is a drastic remedy which is disfavored by the courts and is infrequently granted. *See International Longshoremen's Ass'n, S.S. Clerks Local 1624, AFL–CIO v. Virginia Intern. Terminals, Inc.,* 904 F.Supp. 500, 504 (E.D.Va.1995); *First Financial Sav. Bank v. American Bankers Ins. Co.,* 783 F.Supp. 963, 966 (E.D.N.C.1991); *United States v. Fairchild Indus. Inc.,* 766 F.Supp. 405, 408 (D.Md.1991); *Clark v. Milam,* 152 F.R.D. 66, 70 (S.D.W.Va.1993). Motions to strike are viewed with such disfavor "because it is difficult to establish that a defense is clearly insufficient." *Spell v. McDaniel,* 591 F.Supp. 1090, 1112 (E.D.N.C.1984).

■ The striking of defenses is, however, appropriate if a defense is clearly legally insufficient as, for example, when there is clearly no bona fide issue of fact or law.

---

4. Federal law, however, governs the procedural issues in this case. It is interesting to note that there is no federal requirement that mitigation of damages be plead as an affirmative defense. *See* Fed.R.Civ.P. 8(c).

*Fairchild Indus. Inc.,* 766 F.Supp. at 408. On the other hand, a motion to strike insufficient defenses, "should not be granted when the sufficiency of the defense depends upon disputed issues of fact or unclear questions of law." *United States v. Marisol, Inc.,* 725 F.Supp. 833, 836 (M.D.Pa.1989). *See also Shenandoah Life Ins. Co. v. Hawes,* 37 F.R.D. 526, 530 (E.D.N.C.1965) ("It is well settled that the motion to strike in federal pleadings is not a favored method of raising disputed questions of law."). When questions of law are not well established, the decision of whether to strike a defense is "quite properly . . . viewed as determinable only after discovery and a hearing on the merits." 5A *C. Wright and A. Miller* § 1381 at 674–676 (1990). Thus, "even when technically appropriate and well-founded, [a motion to strike is] often not granted in the absence of a showing of prejudice to the moving party." *Id.* at 672. *See also Augustus v. Board of Public Instruction,* 306 F.2d 862, 868 (5th Cir.1962) ("the courts generally are not willing to determine disputed and substantial questions of law upon a motion to strike. Under such circumstances, the court may properly, and we think should, defer action on the motion and leave the sufficiency of the allegations for determination on the merits"); *Brown & Williamson Tobacco Corp. v. United States,* 201 F.2d 819, 822 (6th Cir.1953) ("The motion to strike should be granted only when the pleading to be stricken has no possible relation to the controversy"); *Tonka Corp. v. Rose Art Industries, Inc.,* 836 F.Supp. 200, 218 (D.N.J.1993) ("Even where the facts are not in dispute, Rule 12(f) is not meant to afford an opportunity to determine disputed and substantial questions of law."); *Budget Dress Corp. v. International Ladies' Garment Workers' Union,* 25 F.R.D. 506, 508 (S.D.N.Y.1959) ("A motion to strike for insufficiency was never intended to furnish an opportunity for the determination of disputed and substantial questions of law and is not granted if insufficiency of the defense is not clearly apparent"); *Samuel Goldwyn, Inc. v. United Artists Corp.,* 35 F.Supp. 633, 637 (S.D.N.Y. 1940) ("A motion to strike should be granted only when the allegations have no possible relation to the controversy. When the court

is in doubt whether under any contingency the matter may raise an issue, the motion should be denied."); *Radtke Patents Corp. v. C.J. Tagliabue Mfg. Co.,* 31 F.Supp. 226, 226 (E.D.N.Y.1939) (stating that a motion to strike "is not favored, . . . will be granted only when the allegations have no possible relation to the controversy . . . [and] should not be granted if the court is in any doubt that it cannot avail as a defense, or if under any contingency it may raise an issue.").

"The purpose of such narrow standards is 'to provide a party the opportunity to prove his allegations if there is a possibility that his defense or defenses may succeed after a full hearing on the merits.'" *United States v. 187.40 Acres of Land,* 381 F.Supp. 54, 56 (M.D.Pa.1974) (quoting *Carter–Wallace Inc. v. Riverton Laboratories,* 47 F.R.D. 366, 368 (S.D.N.Y.1969)). This approach is consonant with the recognition by the courts that striking portions of pleadings is disfavored and considered a drastic remedy. *See, e.g., Stewart Invest. Co. v. Bauer Constr. Co.,* 323 F.Supp. 907 (D.Md.1971) ("'A motion to strike, however, is not favored and will be denied unless the allegations attacked have no possible relation to the controversy and may prejudice the other party.'") (quoting *Brown & Williamson Tobacco Corp. v. U.S.,* 201 F.2d 819; *Jones v. Thunderbird Transp. Co.,* 178 F.Supp. 9 (D.Kan.1959); *Thompson v. United Artists Theatre Circuit, Inc.,* 43 F.R.D. 197 (S.D.N.Y.1967)). *See generally* 27A Fed.Proc., L.Ed. §§ 62:436–62:442 (1996).

■ Alternatively, "it is equally important to recognize that a motion to strike insufficient defenses does serve a useful purpose by eliminating insufficient defenses and saving the time and expense which would otherwise be spent in litigating issues which would not affect the outcome of the case." *Fairchild Indus. Inc.,* 766 F.Supp. at 408. Thus, prior to striking defenses the "court must be convinced 'there are no questions of fact, that any questions of law are clear and not in dispute, and that under no set of circumstances could the defense succeed.'" *Clark,* 152 F.R.D. at 70 (quoting *BA Mortgage & Int'l Realty v. Am. Nat'l Bank,* 706 F.Supp. 1364, 1375–76 (N.D.Ill.1989)).

As a threshold matter, therefore, the Court will discuss if the defenses at issue are, as a matter of law, clearly established or are in dispute to the extent that striking them from the case and, thus, prohibiting discovery concerning their subject matter, would be improper.

The plaintiff asserts that the federal common law principle known as the "no duty" rule precludes the defendant from discovering documents, deposition testimony, or answers to interrogatories that relate to the defendant's affirmative defenses. That is, the plaintiff, as receiver of CapCorp has "no duty" to wrongdoers, *i.e.*, the defendant, who allegedly caused CapCorp to fail, and therefore the actions of the plaintiff are not relevant or at issue in this suit brought on behalf of CapCorp. "The 'no duty' rule essentially provides that the actions of a receiver vis-a-vis a failed financial institution are not at issue and may not be inquired into in a lawsuit a receiver brings on behalf of the failed institution against persons who have wronged the institution, because the receiver owes 'no duty' to such persons, but only owes a duty to the depositors and creditors of the institution, the insurance fund and to the public." (Paper No. 18 at 16).

For the reasons presented below, the Court is not persuaded by the plaintiff's arguments. Generally, the viability of the "no duty" rule has been called into question since the Supreme Court's decision in *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994). Additionally, the plaintiff fails to satisfactorily address the "no duty" rule's application to a case such as the one at bar; that is, instances where the regulatory agency brings suit *not* against the officers and directors of the failed institution, but against parties whose actions or omissions prior to the take-over in some way allegedly contributed to the failure of the institution. It is clear, therefore, that assuming, *arguendo*, that the plaintiff had filed a timely motion to strike or that the Court

addressed the issue *sua sponte,* the Court is not convinced that the questions of law here presented are clear and not in dispute. *See Clark,* 152 F.R.D. at 70; 5A *C. Wright and A. Miller* § 1381 at 674–676 (1990 & Supp. 1999) and cases there collected. Accordingly, the striking of the affirmative defenses would be ill-advised.

### The "No Duty" Rule

Prior to the Supreme Court's decision in *O'Melveny & Myers,* the majority of federal courts held that "defendant tortfeasors in failed bank litigation cannot limit their liability by attacking the conduct of the federal banking agencies." *FDIC v. Gladstone,* 44 F.Supp.2d 81, 85 (D.Mass.1999). *See, e.g., FDIC v. Oldenburg,* 38 F.3d 1119, 1121–1122 (10th Cir.1994) *cert. denied sub nom.* 516 U.S. 861, 116 S.Ct. 171 (1995) and cases there cited; *FDIC v. Mijalis,* 15 F.3d 1314, 1324–1325 (5th Cir.1994); *FDIC v. Bierman,* 2 F.3d 1424, 1438–1441 (7th Cir.1993); *RTC v. Hecht,* 818 F.Supp. 894 (D.Md.1992) (striking affirmative defenses raised by former officers and directors of a failed savings and loan, sued for breach of contract in association with six bad loans, because the losses attributed to the loans were "wholly unrelated" to the receiver or its predecessor); *RTC v. Youngblood,* 807 F.Supp. 765, 771–774 (N.D.Ga.1992); *FDIC v. Isham,* 782 F.Supp. 524, 530–532 (D.Colo.1992); *FSLIC v. Burdette,* 718 F.Supp. 649, 662 (E.D.Tenn.1989); *FSLIC v. Williams,* 599 F.Supp. 1184, 1204–1206 (D.Md.1984); *FSLIC v. Roy,* 1988 WL 96570 (D.Md.1988) (striking affirmative defenses for, *inter alia,* negligence concerning twenty seven commercial loans, because the receivers had "no duty" to the defendants, the conduct of the receiver underlying the affirmative defenses occurred after the defendant's initiated the suspect loans, and but for the defendant's alleged wrong doing the receiver would not have taken over the institution and its alleged negligent acts would not have been available as an affirmative defense).[5]

---

**5.** A handful of courts denied the striking of affirmative defenses. *See FDIC v. Ashley* 749 F.Supp. 1065, 1068–1069 (D.Kan.1990) ("the defense of failure to mitigate damages is still available to the ... defendants because the legal requirement

to mitigate damages is not actually a 'duty,' but a limitation on the amount of damages recoverable by the plaintiff"); *FDIC v. Niblo,* 821 F.Supp. 441, 451–454 (N.D.Tex.1993) (declining to strike the affirmative defenses of waiver, estoppel, and

These holdings were generally predicated on the following rationale: (1) the FDIC owes "no duty to those institutions or to those whose negligence has brought them to the brink of disaster" (*Roy,* 1988 WL 96570 at *1); (2) public policy prohibits defendant directors and officers from asserting affirmative defenses against .federal receivers, reasoning that the risk of errors in judgment by regulatory personnel should · be borne by the directors and officers who were wrongdoers in the first instance rather than by the national insurance fund (*Oldenburg,* 38 F.3d at 1121; *Mijalis,* 15 F.3d at 1323–1324); and (3) because the conduct of the federal receivers should not be subjected to judicial second guessing (*Mijalis,* 15 F.3d at 1324).

The defendant asserts, however, that the above approach has been abrogated by *O'Melveny & Myers,* 512 U.S. 79, 114 S.Ct. 2048, in which the Supreme Court held that in an action by the FDIC, acting as receiver,

in which the defendant raised the affirmative defense of imputation, State law controlled. *Id.* at 81–82, 86, 114 S.Ct. 2048.[6] The Supreme Court admonished that " '[t]here is no federal general common law' ", *id.* at 83, 114 S.Ct. 2048 (quoting *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)) and noted that the FDIC had not identified any " 'significant conflict [between the use of state law and some federal policy or interest]' ", *id.* at 88, 58 S.Ct. 817 (quoting *Wallis v. Pan American Petroleum Corp.,* 384 U.S. 63, 68, 86 S.Ct. 1301, 16 L.Ed.2d 369); and that the FDIC, because it was acting as receiver, was asserting the rights of the failed bank, rather than its own. *Id.* at 85, 58 S.Ct. 817. *Cf. Atherton v. FDIC,* 519 U.S. 213, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997) ("There is no federal common law that would create a general standard of care applicable to" actions constituting gross negligence).[7]

failure to mitigate damages finding no support for the proposition that estoppel may not be asserted against the government as a matter of law, and that waiver and mitigation of damages are not related to a duty to the alleged wrongdoer, but a duty a plaintiff owes itself and is a question of fact, not law); *FDIC v. Blackburn,* 109 F.R.D. 66, 74 (E.D.Tenn.1985) (denying motion to assert counterclaim and amend answer of former officers and directors of a failed savings and loan was "not intended to interfere in any way with defendant's attempt to raise the defense of failure to mitigate damages.... There can be no doubt that the role of the FDIC in trying to liquidate the assets of [the failed institution] and in attempting to marshal its assets is a proper subject of inquiry during discovery. Nor is the foregoing intended to prevent defendants from raising a defense of intervening cause occasioned by the conduct of a person or entity which owed some duty of care to the bank").

**6.** In *O'Melveny,* the Supreme Court considered whether, in a suit by the FDIC as receiver of a federally insured bank, federal or state law governed the tort liability of attorneys who provided services to the bank. 512 U.S. at 80–81, 114 S.Ct. 2048. After the FDIC took over as receiver, investors claiming that they had been deceived in connection with two real estate syndications operated by the failed bank demanded refunds. *Id.* at 81, 114 S.Ct. 2048. The FDIC caused the bank to rescind the syndications and return the investors' money plus interest. *Id.* The FDIC then sued the bank's attorneys, alleging professional negligence and breach of fiduciary duty, presumably for failing to inform the bank of the *ultra vires* acts of its officers. *Id.*

The attorneys moved for summary judgment claiming that, under California law, knowledge of the conduct of the bank's controlling officers must be imputed to the bank and thus to the FDIC which, as receiver, stood in the shoes of the bank. *Id.* The FDIC asserted that, once the FDIC became the bank's receiver, federal common law determines whether the knowledge of corporate officers acting against the corporation's interest will be imputed to the corporation. *Id.* The Supreme Court held that state law governs the imputation defense and remanded the case for proceedings in accordance with that determination. *Id.* at 89, 114 S.Ct. 2048.

**7.** In *Atherton,* the FDIC brought suit against the officers and directors of a failed financial institution. There, the question was whether state law, federal statute, or federal common law set the legal standard for determining whether the officers' and directors' behavior was proper. The Court stressed that "the guiding principle" in the decision of courts to fashion "federal common law" is that a significant conflict exist between a federal policy or interest and the state law. 519 U.S. at 218, 117 S.Ct. 666. The Court rejected the FDIC's assertions that a conflict existed based on (1) a "generalized plea for uniformity" (*id.* at 219–220, 117 S.Ct. 666 ("the concept of uniformity is not to prove its need") (citing *O'Melveny,* 512 U.S. at 88, 114 S.Ct. 2048)), (2) the federal bank's national charter (*Atherton,* 519 U.S. at 222–223, 117 S.Ct. 666 ("a federal charter by itself shows no conflict, threat, or need for 'federal common law.' ")) and (3) the "internal affairs doctrine" (*id.* at 223–225, 117 S.Ct. 666) ("The internal affairs doctrine ... seeks only to

The *O'Melveny* Court did not specifically address the federal common law "no duty" rule, however, it did state some general propositions which are inconsistent with the existence of that federal common law doctrine. While the Court is unaware of any federal appellate courts reaching the specific issue of how the *O'Melveny* decision affects the federal common law "no duty" rule, numerous circuits have recognized *O'Melveny*'s significance beyond the narrow area of imputation. *See DiVall Insured Income Fund Ltd. Partnership v. Boatmen's First Nat'l Bank of Kansas City*, 69 F.3d 1398, 1401–1403 (8th Cir.1995) (holding that *O'Melveny* removed the common law *D'Oench Duhme* doctrine and the federal holder in due course doctrine as bars to a defendant's affirmative defenses); *Murphy v. FDIC*, 61 F.3d 34, 35 (D.C.Cir.1995) (holding that *O'Melveny* removes the federal common law *D'Oench Duhme* doctrine as a separate bar to claims); *RTC v. Maplewood Investments*, 31 F.3d 1276, 1294 (4th Cir.1994) (holding that *O'Melveny* creates a heavy presumption in favor of applying state law rules of negotiability); *FDIC v. Massingill*, 30 F.3d 601, 604 (5th Cir.1994) (holding that, in light of *O'Melveny*, courts should not create federal common law rule of decision with respect to defendant's ability to assert the defense of impairment of collateral). *See also* Cherie Stephens Beck, Comment, *Alive, But Not Quite Kicking; Circuit Split Illustrates the Progressive Deterioration of the D'Oench, Duhme Doctrine*, 42 St. Louis U.L.J. 945 (Summer 1998); Edgar Glass, Notes & Comments, *The Precarious Position of the Federal Deposit Insurance Corporation After O'Melveny & Myers v. FDIC*, 9 Admin.L.J.Am.U. 373 (Summer 1995).

Numerous district courts have, however, addressed the issue of whether the Supreme Court's decision in *O'Melveny* abrogated the common law doctrine of the "no duty" rule. *See, e.g., FDIC v. Gladstone*, 44 F.Supp.2d 81 ("there is no sound reason, based on either state or federal common law, for striking Defendants' various affirmative defenses based on the actions of the FDIC"); *FDIC v. Haines*, 3 F.Supp.2d 155, 159–165 (D.Conn. 1997) (denying motion for partial summary judgment on affirmative defenses because, following *O'Melveny*, "the affirmative defenses presented here are not barred by a federal common law precept"); *FDIC v. Pelletreau & Pelletreau*, 965 F.Supp. 381, 390 (E.D.N.Y. 1997) (denying motion to strike the affirmative defenses of comparative and contributory negligence, failure to mitigate, laches, and equitable estoppel, because of the unsettled and substantial nature of the law); *FDIC v. Schreiner*, 892 F.Supp. 848 (W.D.Tex.1995) (O'Melveny applies to suits against FDIC in its capacity as receiver; following *Liebert*); *RTC v. Liebert*, 871 F.Supp. 370 (C.D.Cal. 1994) (*O'Melveny* prohibits use of federal common law as grounds to bar state law affirmative defenses); *RTC v. Baker*, 1994 WL 637359 (E.D.Pa.1994) (*O'Melveny* requires sufficiency of affirmative defenses to be examined pursuant to state law); *RTC v. Ross*, 1994 WL 534210 at *4–*7 (S.D.Miss. 1994) (reforming order to strike affirmative defenses based on *O'Melveny*); *Resolution Trust Corp. v. Hecht*, No. MJG–92–371 (D.Md. Nov. 7, 1994) (denying motion to strike affirmative defenses on grounds that *O'Melveny*'s impact was unclear). *Cf. FDIC v. Refco Group, Ltd.*, 989 F.Supp. 1052, 1086–1089 (D.Colo.1997) (denying FDIC's motion for summary judgment on affirmative defenses pursuant to Colorado state law); *RTC v. Williams*, 1994 WL 477231, at *3–*4 (D.Kan. 1994) (noting that "the *O'Melveny* Court did not address the issue of whether defenses based upon the post-closing activities of the RTC or other receiver could be asserted as affirmative defenses," but holding "in light of *O'Melveny*'s broad statements that a receiver stands in the shoes of the failed institution and is subject to the same state law defenses that would have been applicable to the institution or any other assignee," that court should "explore whether the defenses of es-

avoid conflict by requiring that there be a single point of legal reference. Nothing in that doctrine suggests that the single source of law must be federal."). The Court also stated that "as in *O'Melveny*, the FDIC is acting only as a receiver of a failed institution; it is not pursuing the interest of the Federal Government as bank insurer—an interest likely present whether the insured institution is state, or federally, chartered." *Id.* at 225, 117 S.Ct. 666. In the instant case the plaintiff has not asserted that a conflict exists between federal and state law.

toppel and mitigation of damages may now be asserted against the RTC" and calling for further briefing). *But see RTC v. Bright,* 157 F.R.D. 397, 400 (N.D.Tex.1994) (rejecting, without explanation, defendant's argument that *O'Melveny* permits the assertion of affirmative defenses); *FDIC v. Collins,* 920 F.Supp. 30, 33–34 (D.Conn.1996) (holding that the FDIC had no duty to advise the defendants "of their responsibility to the bank and suggest a procedure for addressing the 'loan to one borrower' problem."); *FDIC v. Raffa,* 935 F.Supp. 119, 124–129 (D.Conn. 1995) (rejecting affirmative defenses "which either assert some duty was owed and breached by the FDIC, or which challenge the discretionary decisions of the FDIC."); *RTC v. Sands,* 863 F.Supp. 365, 368–373 (N.D.Tex.1994) (*O'Melveny* does not call into question the deference afforded the discretionary decisions of the RTC); *RTC v. Edie,* 1994 WL 744672 at *3 (D.N.J.1994) (objections to the RTC's discretionary powers lie outside *O'Melveny* and remain precluded by the "no duty" rule).

*Gladstone,* 44 F.Supp.2d 81, presents a well reasoned approach permitting the assertion of affirmative defenses against federal receivers. The Court discussed the three rationales delineated above; *i.e.,* receivers have no duty to the tortfeasors whose conduct required the intervention of the receiver; the public policy that tortfeasors should bear the burden of their wrongdoing and not the insurance fund or the public at large; and the receiver's interest in exercising its discretion without judicial second-guessing. Specifically, the Court held that the premise of the " 'no duty' argument is mistaken." *Id.* at 87. Rather, the Court determined that the issue is more properly framed that once a receiver takes over an institution it must not conduct itself in such a way that it " 'causes

losses to the failed financial institution that could have been avoided, either by diligent collection efforts, diligent and proper marshaling of or proceeding against valuable collateral, or otherwise.' " *Id.* (quoting *Niblo,* 821 F.Supp. at 455). Specifically, it found that while losses incurred in the takeover of a financial institution are "not to be considered avoidable" receivers are also "not free to choose an alternative that is both less certain and probably less lucrative." *Id.*

Regarding the public policy that tortfeasors should bear the burden of their wrongdoing and not the insurance fund or the public at large, Judge Gertner noted that this is tantamount to permitting the FDIC to win regardless of the situation. Quoting *O'Melveny,* 512 U.S. at 88, 114 S.Ct. 2048 the court noted that " 'there is no federal policy that the fund should always win.' " *Id.* at 88, 114 S.Ct. 2048.

Finally, regarding the regulator's interest in exercising its discretion without judicial second-guessing, the court declared that "it is not sufficiently clear that ... [the] value [of] freedom from judicial second-guessing— is in 'substantial conflict' with state law within the meaning of *O'Melveny." Id.* at 88, 114 S.Ct. 2048.

Alternatively, the plaintiff brings two cases to the Court's attention in support of its assertion that *O'Melveny* did not alter the federal common law "no duty" rule: *FDIC v. Healey,* 991 F.Supp. 53 (D.Conn.1998) and *RTC v. Bright,* 157 F.R.D. 397 (N.D.Tex. 1994).[8] In *Healey,* the Court recognized the split of authority within its own district[9] and methodically analyzed the effect of *O'Melveny* and *Atherton* on the availability of affirmative defenses in actions brought by a receiver, pursuant to the Financial Institutions

---

8. *Bright* contains no discussion of its reasons for striking affirmative defenses and, therefore, is not discussed herein.

9. *Compare Haines,* 3 F.Supp.2d at 162 ("The relevant portion of *O'Melveny* analysis unambiguously held that courts may not modify or supplement FIRREA with a federal common law rule. The court further concludes that the plaintiff has failed to demonstrate that there existed a conflict between [state] common law and a significant federal policy or interest sufficient to

justify the judicial creation of a special federal common law rule. In so concluding, the court expressly rejects the rationale relied upon by the courts in *FDIC v. Raffa,* 935 F.Supp. 119 (D.Conn.1995) and *FDIC v. Collins,* 920 F.Supp. 30 (D.Conn.1996)") and *FDIC v. Healey,* 991 F.Supp. 53 (D.Conn.1998) (disagreeing with the reasoning in *Haines* and holding that the affirmative defenses of failure to mitigate damages and contributory negligence were legally insufficient and ordering them stricken).

Reform, Recovery and Enforcement Act of 1989 (FIRREA), 12 U.S.C. § 1821(k) [10] and state negligence law. The Court ultimately found that *O'Melveny* and *Atherton* concerned pre-conservatorship conduct. Hence, the holdings were inapplicable because the affirmative defenses at issue attacked the FDIC's post-conservatorship discretionary conduct. "The defenses of failure to mitigate damages and contributory negligence would require the Court to scrutinize discretionary decisions made by the FDIC after assuming receivership ... and in implementing the significant policies of FIRREA. There is nothing, however, in the statute that imposes on the FDIC the duty to conduct its liquidation activities in a manner that would minimize potential liability of former officers and directors of the institution.[11] State law that would hold the FDIC liable for its failure to mitigate damages would present a 'significant conflict' with federal policy embodied in FIRREA and should be displaced." 991 F.Supp. at 61.

It is clear from the above discussion that the law as it relates to the viability of the "no duty" rule is far from lucid. Further muddying these waters is the fact that *Healey, Gladstone* and, indeed, the great majority of cases that implicate the "no-duty" rule involved a receiver agency seeking to replenish funds expended to stabilize a failed financial institution as against the officers or directors of that institution. In the present action the plaintiff is not asserting a cause of action against the officers and directors of a failed institution.[12] Rather, it is seeking reimbursement from a "brokerage firm and its

---

**10.** 12 U.S.C. § 1821(k) states as follows:

(k) Liability of directors and officers
A director or officer of an insured depository institution may be held personally liable for monetary damages in any civil action by, on behalf of, or at the request or direction of the Corporation, which action is prosecuted wholly or partially for the benefit of the Corporation—
(1) acting as conservator or receiver of such institution,
(2) acting based upon a suit, claim, or cause of action purchased from, assigned by, or otherwise conveyed by such receiver or conservator, or
(3) acting based upon a suit, claim, or cause of action purchased from, assigned by, or otherwise conveyed in whole or in part by an insured depository institution or its affiliate in connection with assistance provided under section 1823 of this title, for gross negligence, including any similar conduct or conduct that demonstrates a greater disregard of a duty of care (than gross negligence) including intentional tortious conduct, as such terms are defined and determined under applicable State law. Nothing in this paragraph shall impair or affect any right of the Corporation under other applicable law.

**11.** FIRREA does, however, state that

In exercising any right power, privilege, or authority as conservator or receiver in connection with any sale or disposition of assets of any insured depository institution for which the Corporation has been appointed conservator or receiver, including any sale or disposition of assets acquired by the Corporation shall conduct its operations in a manner which—
(i) maximizes the net present value return from the sale or disposition of such assets;
(ii) minimizes the amount of loss realized in the resolution of cases ...
12 U.S.C. § 1821(d)(13)(E).
Thus, while there is no specific duty to the officers and directors, the statute requires that the FDIC maximize its return on liquidated assets *and minimize* its loss in resolving claims against the failed institution. Failure to so proceed would result in the FDIC acting contrary to its mandate and, hence, in a non-discretionary manner.

**12.** Such an action would be brought pursuant to 12 U.S.C. § 1787(h) that states as follows:

(h) Liability of directors and officers
A director or officer of an insured credit union may be held personally liable for monetary damages in any civil action by, on behalf of, or at the request or direction of the Board, which action is prosecuted wholly or partially for the benefit of the Board—
(1) acting as conservator or liquidating agent of such insured credit union,
(2) acting based upon a suit, claim, or cause of action purchased from, assigned by, or otherwise conveyed by such liquidating agent or conservator, or
(3) acting based upon a suit, claim, or cause of action purchased from, assigned by, or otherwise conveyed in whole or in part by an insured credit union or its affiliate in connection with assistance provided under section 1788 of this title, for gross negligence, including any similar conduct or conduct that demonstrates a greater disregard of a duty of care (than gross negligence) including intentional tortious conduct, as such terms are defined and determined under applicable State law. Nothing in this paragraph shall impair or affect any right, if any, of the Board under other applicable law.

agent" that sold commercial instruments to the failed bank. (Paper No. 1 at 1).

Even prior to *O'Melveny* and the current split among the federal district courts there was no clear consensus regarding the applicability of the "no duty" rule to retained professional defendants, as opposed to officers or directors of the failed institution. *See, e.g., FDIC v. Ernst & Young,* 967 F.2d 166 (5th Cir.1992) (permitting accountants to assert affirmative defenses against a receiving agency); *RTC v. Holland & Knight,* 832 F.Supp. 1532 (S.D.Fla.1993) (same as to attorneys); *FDIC v. Cherry, Bekaert & Holland,* 742 F.Supp. 612 (M.D.Fla.1990) (same as to accountants). *But see RTC v. Heiserman,* 839 F.Supp. 1457, 1465–1468 (D.Colo. 1993) (rejecting the rationale of *Holland & Knight* and holding that "the 'no duty rule' remains viable as to third party professionals").

In *Holland & Knight,* the RTC, as successor in interest, filed an action against the bank's attorneys for legal malpractice and breach of fiduciary duty. 832 F.Supp. at 1533. In denying the RTC's motion to strike the affirmative defenses of com parative/contributory negligence, waiver, ratification, laches, failure to mitigate and estoppel pursuant to Rule 12(f), the court distinguished retained professionals from officers and directors of a failed financial institution. *Id.* at 1536–1537. The court reasoned that officers and directors are employees of a financial institution with control and oversight responsibilities over the institution's transactions. *Id.* Therefore, the court found that public policy dictates that officers and directors should not be permitted to shield their past activities behind the veil of institutional approval. *Id.* On the other hand, retained professionals have no control or oversight function or responsibilities over the practices which allegedly gave rise to the insolvency. *Id.* The court concluded that the public policy underpinnings of FIRREA are therefore irrelevant to actions involving retained professionals. *Id.* at 1540.

Similarly, the Middle District of Florida also concluded that a retained professional could raise affirmative defenses against a receiver agency. *FDIC v. Cherry, Bekaert &*

*Holland,* 742 F.Supp. 612. In *Cherry, Bekaert & Holland,* the FDIC brought an action against an accounting firm for an alleged negligent audit of the bank. The accountants raised the affirmative defenses of comparative/contributory negligence and failure to mitigate damages against the bank's officers and directors for actions taken before receivership of the bank, and the accountants raised the same affirmative defenses against the FDIC for actions taken after the bank was placed in receivership. *Id.* The court permitted the accountant defendants to assert affirmative defenses against the FDIC because "[a]lthough the FDIC is protected from defenses of fraud on the part of the failed bank, or oral agreements between the borrower and the failed bank, defenses often asserted by borrowers when the FDIC seeks to collect on defaulted loans, this protection is afforded only when necessary to further the policy of promoting the stability of the nation's banking system by facilitating the FDIC's smooth acquisition of assets in a purchase and assumption transaction." *Id.* at 613 (internal citation omitted). But, "when the FDIC acts to dispose the assets of the bank, these actions fall outside the public policy role of the FDIC and may serve as a basis for a counterclaim and affirmative defense." *Id.* (citation omitted).

The Fifth Circuit addressed similar issues in *FDIC v. Ernst & Young,* 967 F.2d 166 (5th Cir.1992). Relying upon *Cherry, Bekaert & Holland,* the court concluded that the FDIC should be treated as an ordinary private plaintiff. *Id.* at 169. The Fifth Circuit found that "the FDIC is not entitled to special protection when it brings a tort claim against a third-party on behalf of a defunct financial entity." *Id.* at 170.

This Court is compelled to state the obvious: it was the receiver that brought this action against, not the officers and directors of CapCorp, but against a broker and dealer of securities. Furthermore, absent the ability of the plaintiff to "step into the shoes" of CapCorp it would have no cause of action. To permit these state law causes of action by NCUA in the shoes of CapCorp, as against a third party, but at the same to preclude that third party from asserting affirmative de-

fenses it would have been free to bring against CapCorp would sanction an imbalance not mandated by the remedial legislation on the financial institutions and the crisis from which the legislation arose.

Indeed, *O'Melveny* does not support such a result. Justice Scalia, writing for the Court, identified the central issue of the case to be whether state law was to be applied to the affirmative defense of imputation or whether state law was "displaced." 512 U.S. at 85, 114 S.Ct. 2048. The Court first examined the applicable federal statutes in Its determination so as not to "contradict an explicit federal statutory provision [ ][or] adopt a court-made rule to supplement federal statutory regulation that is comprehensive and detailed" stating that ·"matters left unaddressed in such a scheme are presumably left subject to disposition provided by state law." *Id.* The Court recognized that FIRREA was a comprehensive legislative scheme and identified a provision of that legislation, codified as 12 U.S.C. § 1821(d)(2)(A)(i), as the applicable specific statutory provision. *Id.* at 86, 114 S.Ct. 2048. The Court determined that the language contained therein, " 'the [FDIC] shall, by operation of law, succeed to—all rights, titles, powers, and privileges of the insured depository institution' ... place[d] the FDIC in the shoes of the insolvent S & L, to work out its claims under state law,

except where some provision in the extensive framework of FIRREA provides otherwise." *Id.* (quoting 12 U.S.C. 1821(d)(2)(A)(1)). Ultimately, the Court held that state law applied.

Applying this paradigm to the instant facts yields a similar result. Credit Unions are also subject to a comprehensive federal statutory scheme. *See* Federal Credit Union Act, 12 U.S.C. § 1751–1795k. In 1989, FIRREA supplemented the Federal Credit Union Act with provisions comparable to those relied upon in *O'Melveny*. *See* Pub.L. No. 101–73 §§ 915(c), 1217, 103 Stat. 183. Specifically, 12 U.S.C. § 1787(b)(2)(A)(i) states that the NCUA "shall, as conservator or liquidating agent, and by operation of law, succeed to—all rights, titles, powers, and privileges of the credit union...." Accordingly, following *O'Melveny* the NCUA stepped into the shoes of CapCorp and must "work out its claims against the defendant under state law, except where some provision in the extensive framework of FIRREA provides otherwise." 512 U.S. at 87, 114 S.Ct. 2048. The Court is not aware of and the plaintiff has not identified any applicable provision of Title 12 that so provides. Hence, the rationale espoused in *O'Melveny* supports a finding that the instant parties must look to state law to determine if affirmative defenses are available to the defendant.[13]

---

**13.** Moreover, looking to and applying the well established rationale upon which the "no duty" rule was predicated to the instant case reveals that dismissing the defendant's affirmative defenses, as a matter of law, is not appropriate. First, the rationale that the defendant should not be able to assert defenses because it is the cause of the institution's failure and, hence, the reason the receiver was forced to step in is not determinable as a matter of law. Here, the officers and directors of CapCorp made the decision to purchase the CMOs from the defendant. The assertion ·that this decision was in some way tainted or corrupted by actions of the defendant is a matter of fact that has yet to be established.

Additionally, it is also not readily apparent that, as a matter of law, the plaintiff's postconservatorship actions are protected from "judicial second guessing" because it was engaging in a discretionary activity. The plaintiff states that the CMOs were auctioned while it was "[a]cting as conservator" of CapCorp. (Paper No. 48 at 5). The determination of whether the plaintiff was acting within its statutorily prescribed func-

tion is determined by examining 12 U.S.C. § 1787 that states, in pertinent part, as follows:
    (b) Powers and duties of Board as conservator or liquidating agent
    * * * * *
    (2) General Powers
    * * * * *
    (D) Powers as conservator
    The Board may, as conservator, take such action as may be—
        (1) necessary to put the credit union in a sound and solvent condition; and
        (2) appropriate to carry on the business of the credit union and preserve and conserve the assets and property of the credit union.
    (D) Additional powers as liquidating agent
    The Board may, as liquidating agent, place the credit union in liquidation and proceed to realize upon the assets of the credit union, having due regard to the conditions of credit in the locality.
Thus, it is not clear that the auction of 75% of CapCorp's portfolio was within the plaintiff's discretion. There is little question that as a liquidating agent the plaintiff was empowered with

At a minimum, therefore (even as to officers and directors of failed institutions), it is clear that the legal issues of whether the "no duty" rule survives *O'Melveny & Myers* or applies at all to cases where third parties are sued by the receiver agency are extremely complex and highly disputed. The Fourth Circuit has yet to address these issues. The Court has reviewed and considered the parties' papers and heard argument on this matter and finds that the issues presented are precisely the substantial issues of law that are properly determinable only after discovery and a hearing on the merits. *Farrie v. Charles Town Races, Inc.*, 901 F.Supp. 1101, 1104 (N.D.W.Va.1995); *Fairchild Indus., Inc.*, 766 F.Supp. at 408; *Clark*, 152 F.R.D. at 70; *Shenandoah Life Ins. Co.*, 37 F.R.D. at 530. *See also* 5A *C. Wright and A. Miller* § 1381 at 674–676 (1990).

The Court shall now apply the preceding legal principles to the motions at issue.

### The Deposition of Robert Swan

█ As stated previously, the defendant complied and exhausted the procedures required by 12 C.F.R. §§ 729.41–792.49. Of the twenty-one areas of inquiry identified by the defendant the plaintiff placed limits on four.[14] The contested queries and the attendant objections are as follows:

> the discretion to sell these assets. As conservator, however, it is a question of fact whether such a drastic action was "necessary to put [CapCorp] in a sound and solvent condition and appropriate to carry on the business of [CapCorp] and preserve and conserve the assets and property of [CapCorp]." 12 U.S.C. 1787(b)(2)(D).
>
> Finally, the public policy against making the public bear the costs of errors in judgment by the receiver rather than the persons found to be guilty of wrongdoing presupposes that the defendants in this case are tortfeasors. Again, that is a question of fact that has yet to be determined. Moreover, such rationale was decried by the Court in *O'Melveny*, 512 U.S. at 88, 114 S.Ct. 2048 ("there is no federal policy that the fund should always win").

14. Likewise, of the sixteen areas of inquiry regarding Carver and Hoyle only two were objected to as follows:

> 1. Whether, as Swan alleged, a group of individuals at NCUA secretly decided in 1994 and 1995 to liquidate CapCorp, and, if so, the identity of the group's members, when, where, and

1. The facts underlying Swan's assertion that the loss at issue in this case was "forced" by NCUA, and was "unnecessary and avoidable";

2. The facts underlying Swan's assertion that a group of individuals at NCUA made a "secret decision" in 1994 or 1995 to liquidate Capital Corporate Federal Credit Union ("CapCorp"); [15]

*Paragraphs 1 and 2:* First Union shall not inquire about NCUA's internal policy deliberations occurring after January 30, 1995, the date the conservatorship was imposed.[16]

8. Whether NCUA Chairman D'Amours or other individuals at NCUA made public statements in 1994 or 1995 which were expected to, and did, have the effect of causing CapCorp, or other credit unions, financial difficulties, and, if so, what those statements were, and when, where, why, and to whom the statements were made; [17]

*Paragraph 8:* First Union shall not inquire about NCUA's public statements in 1995, after imposition of the conservatorship.[18]

9. Whether NCUA established unwritten policies which negatively impacted the financial conditions of CapCorp or other credit unions in 1994 and 1995, and, if so, what those policies were, who adopted and

> why they made this decision, and how this decision was implemented;
> 2. Whether, as Swan and CapCorp witnesses have alleged, NCUA Chairman D'Amours and other individuals at NCUA made public statements in 1994 or 1995 which were expected to, and did, have the effect of causing CapCorp, or other credit unions, financial difficulties, and, if so, what those statements were, and when, where, why, and to whom the statements were made.... (Paper N. 60, Exhibit 1).
> *Paragraphs 1 and 2:* First union shall not inquire about NCUA's internal policy deliberations occurring after January 30, 1995, the date the conservatorship was imposed. (Paper No. 60, Exhibit 2).

15. Paper No. 60, Exhibit 1.

16. Paper No. 60, Exhibit 2.

17. Paper No. 60, Exhibit 1.

18. Paper No. 60, Exhibit 2.

enforced them, and when, why, and against whom those policies were applied; [19]

Paragraph 9: First Union shall not inquire into NCUA's alleged "unwritten policies" occurring after January 30, 1995, the date the conservatorship was imposed.[20]

Pursuant to the previous discussion, the Court finds that the "no duty" rule does not preclude the defendant's ability to discover post-conservatorship actions, taken by the plaintiff, on behalf of CapCorp. Examining the plaintiff's constraints on Mr. Swan's deposition does not, necessarily, result in unfettered discovery.

The subject matter encompassed by Paragraphs 1 and 2 is highly relevant to key elements of the plaintiff's cause of action; i.e. causation and damages. Additionally, facts discovered through such discovery may have a bearing on whether the defendant's actions, vis-a-vis CapCorp, were within its discretion. Furthermore, the subject matter is germane to the defendant's affirmative defenses which are still in this case. Therefore, the limitation imposed by the defendant upon these areas of inquiry is overruled.

The plaintiff also dictated that the defendant is precluded from questioning Mr. Swan concerning *public* statements made by "NCUA Chairman D'Amours and others" in "1995, after the conservatorship." (Paper No. 60, Exhibits 1, 2). The Court is puzzled by this restriction because public statements, in and of themselves, are just that; public. Even assuming, *arguendo*, that the "no duty" rule was available to the plaintiff as a shield to discovery, the statements at issue would not, simply by virtue of their character, be

protected. Thus, the plaintiff's restriction is overruled.

The final restriction, however, gives the Court some pause. The defendant seeks information concerning whether "NCUA established unwritten policies which negatively impacted the financial conditions of CapCorp *or other credit unions* in 1994 and 1995" and the plaintiff seeks to preclude discovery of such information for the period after the initiation of the conservatorship, *i.e.*, January 30, 1995. (*Ibid.*). The subject matter of this inquiry encompasses actions by the plaintiff outside its role as conservator/liquidator. That is, when it is not standing in the shoes of CapCorp, but acting in its role as a regulator of other (or all) financial institutions. The rationale of *O'Melveny* does not apply to such a situation. Moreover, it is not clear that the actions of NCUA as regulator, vis-a-vis other (or all) financial institutions, following the establishment of the conservatorship of CapCorp, is relevant to this case. Thus, the plaintiff's objection to Paragraph 9, to the extent it implicates NCUA's deliberative processes as regulator of financial institutions (as opposed to NCUA's actions as conservator) is upheld.

Accordingly, the Plaintiff's Motion for Protective Order Regarding Deposition of Former NCUA Board Member Robert Swan (Paper No. 51) is DENIED in part and GRANTED in part.

### The Depositions of Karen Kelbly and Leonard Skiles

The sole basis for the plaintiff's motion for a protective order regarding Ms. Kelbly and Mr. Skiles is that the "no duty" doctrine precludes discovery.[21] (Paper No. 53 at 2).

---

19. Paper No. 60, Exhibit 1.

20. Paper No. 60, Exhibit 2.

21. In its motion the plaintiff also states that "this court has held that discovery should proceed regarding pre-conservatorship NCUA actions...." (Paper No. 53 at 2). The Court is compelled to point out that it has not ruled so broadly. In its March 31, 1999 memorandum, the Court found that the plaintiff had failed to meet its burden that the requested discovery was not relevant. (Paper No. 43). *See Spell v. McDaniel*, 591 F.Supp. 1090, 1114 (E.D.N.C. 1984) ("the burden of showing that the requested discovery is not relevant to the issues in this

litigation is clearly on the party resisting discovery."). Specifically, the Court found that the plaintiff's reliance on the "no duty" rule was misplaced and the discretionary function exception discussed in *United States v. Gaubert*, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), dealing with the Federal Tort Claims Act, was inapplicable in the current controversy. Accordingly, the Court found that "[w]ith respect to the decision to apply FAS 115, that decision was made prior to the plaintiff's conservatorship and, thus, the 'no duty' rule is not available to shield the plaintiff from discovery." (Paper No. 43 at 6). Moreover, the Court explained that the "plaintiff failed to identify any authority that grants a government agency immunity from dis-

Consonant with the foregoing discussion the motion is DENIED.

*Defendant's Motion for a Protective Order*

The defendant seeks a protective order staying further depositions by the plaintiff. (Paper No. 55). The plaintiff and the defendant had in place a deposition agreement that permitted the parties to stay in relative parity regarding the taking of depositions. The defendant postponed numerous depositions, however, awaiting the determination of the previously discussed motions. Additionally, the plaintiff's insistence that the defendant comply with federal regulations regarding requests to take testimony of former NCUA board members or former employees further delayed the defendant's ability to take depositions. Consequently, the defendant asserts that the plaintiff had taken eight depositions to its three and that plaintiff's depositions be stayed pending the defendant's "catching up."

The Court agrees that the defendant be allowed to regain parity with the plaintiff in the taking of depositions. Accordingly, the defendant's motion for a protective order is GRANTED to the extent that the defendant shall be allowed to take three consecutive depositions without having to reciprocate to the plaintiff.

***Conclusion***

Pursuant to the above, Plaintiff's Motion for Protective Order Regarding Deposition of Former NCUA Board Member Robert Swan (Paper No. 51) in DENIED in part and GRANTED in part; Plaintiff's Motion for Protective Order Regarding Depositions of Karen Kelbly and Leonard Skiles (Paper No. 53) in DENIED; and Defendant First Union's Motion For Protective Order Staying Further Depositions By Plaintiff National Credit Union Administration (Paper No. 55) is GRANTED. A separate ORDER shall issue.

covery simply because the decisions at issue were made in the course of regulating an industry." (Paper No. 43 at 5). The Court has repeatedly invited the plaintiff to submit authority, outside the "no duty" rule, to support its position. It has failed to do so.